95 So.2d 902 (1956)
The STATE of Florida, by and through Richard W. Ervin, as Attorney General of the State of Florida, et al., Appellants,
v.
The MASSACHUSETTS COMPANY, a Joint Venture Composed of Southern Scrap Material Company, Ltd., a corporation, N.D. Friedman Company, a corporation; and Eastern Scrap and Salvage Company, a corporation, Appellees.
Supreme Court of Florida. En Banc.
November 16, 1956.
On Rehearing June 12, 1957.
Richard W. Ervin, Atty. Gen., Ralph M. McLane and John D. Moriarty, Asst. Attys. Gen., for appellants.
R.H. Merritt and Joe J. Harrell, Pensacola, for appellees.
J.B. Hopkins, Pensacola, for intervenors.
*903 ROBERTS, Justice.
This controversy had its inception in activities of the appellee, the Massachusetts Company, looking toward the "salvage" of the old battleship Massachusetts, which lies sunken in the Gulf of Mexico off the coast of Escambia County in the territorial waters of the State of Florida. The State of Florida, by its Attorney General, filed the instant suit to enjoin the Company from proceeding with such activities. The Chancellor, on the basis of the pleadings and evidence adduced before him, found that the State had failed to establish a right to the injunctive relief sought and entered a decree in favor of the Company. The State has appealed.
The facts, as found by the Chancellor in his decree, are as follows:
"The United States battleship Massachusetts, after first being used for coast artillery target practice, was scuttled and sunk in the Gulf of Mexico, approximately 1.2 miles off the entrance to Pensacola Bay, Escambia County, Florida, in the year 1922. It has remained there ever since, largely undisturbed except by action of wind and water, which have gradually caused it to sink deeper and deeper into the sand bottom. A portion of the gun turrets is still visible above the surface of the water. The sunken battleship is in such condition that it could not be restored to use as a vessel. It is, however, a haven for small marine life and therefore attracts larger fish that feed upon such organisms. This, in turn, has made the site where the vessel lies a favorite fishing spot, so that it has over the years attracted and still does attract large numbers of anglers from the local community and from distant places. During the past few years, at least, relatively small parts of the ship's brass and fittings have from time to time been removed by individuals not parties to this suit.
"There have been efforts to organize the salvage of the sunken ship at times in the past, but all proved abortive until the venture in which the defendant is now engaged. In the month of August, 1956, the defendant, after preparations extending over the last year or two and involving the outlay of several thousand dollars in expense, secured a navigational permit from the United States Corps of Engineers and commenced salvaging the battleship. Incident to the beginning of the work, the defendant took possession of the ship by marking it with buoys and lines. Within a few days thereafter this suit was filed and, after notice and hearing, the temporary injunction issued.
"The evidence at final hearing shows that the former owner of the battleship, the United States, has left it undisturbed for many years, and the court finds that it was abandoned many years before this suit was begun. A telegram from the Secretary of the Navy, admitted in evidence, announces such abandonment, although it does not state the date of abandonment.
"Upon the basis of the evidence, the court finds and will treat the Massachusetts as an abandoned, sunken wreck of a ship lying in navigable waters of the Gulf of Mexico within the territorial limits of the State of Florida, subject to the laws of the State of Florida and the jurisdiction of this court, and in the possession of the defendant."
To these findings of fact made by the Chancellor, it might be added that the record shows that the wreck of the vessel is not a navigational hazard and that, in addition to being a favorite fishing spot, it is a navigation aid for small boats. It has not sunk any deeper into the sand for the last six or seven years, the last appreciable sinking having followed a hurricane in 1948. It might also be noted that the Chancellor's finding that the Company "took possession of the ship by marking it with buoys and lines" is a conclusion of at least doubtful authenticity. Cf. Eads v. Brazelton, 1861, 22 Ark. 499, *904 79 Am.Dec. 88; Deklyn v. Davis, 1824, 1 Hopk.Ch. 135, 2 N.Y. Ch. 369. But the point is not raised here, and it will be assumed for the purpose of this appeal that the Company had "possession" of the wreck sufficient to exclude other persons of the same class from interfering with the property.
The issue here is whether the State, in its sovereign capacity, has a possessory right or title to the wreck that cannot lawfully be interfered with by the Company. The State contends, in substance, that under Sec. 2.01, Fla. Stat. 1955, F.S.A., Act of Nov. 6, 1829, the "common and statute laws of England which are of a general and not a local nature, * * * down to the fourth day of July, 1776, are declared to be of force in this state," unless inconsistent with the constitution and laws of the United States and the acts of the legislature of this state; that under the common law and statutes of England as they existed in 1776, wrecked and derelict property upon the sea belonged to the Crown unless claimed by an owner within a year and a day; that the state, in its sovereign capacity, succeeded to this prerogative right of the sovereign of England, when it adopted the common law; that no statute inconsistent with such prerogative right has been adopted in this state; but that, on the contrary, statutes have been enacted that are in accord with and in recognition of the common law. The State also contends that the water bottom in question is designated "state land" by Section 253.03, Fla. Stat. 1955, F.S.A., and that the Company's activities violate Sections 821.19 and 821.20, Fla. Stat. 1955, F.S.A., prohibiting and defining "trespass" upon state lands. Other contentions not necessary to relate here are also made.
The Company contends that the wrecked vessel is not within the purview of the common law nor the statutes relied upon by the State as conferring upon the sovereign the prerogative right to wreck, and states in its brief that the case "turns on the law governing the rights of persons with respect to abandoned personal property." Most of its argument is directed to the latter point.
The Chancellor sustained the position of the Company as to the meaning of "wreck" and held that neither the common law, nor the statutes of England here relied upon, 3 Edward I, Ch. 4, and 17 Edward II, Ch. 11, relating to "wreck of the sea," nor the law of Florida, Sections 705.01-03, Fla. Stat. 1955, F.S.A. relating to "wrecked derelict goods," vested in the sovereign any right to the wreck in question. His holding in these respects was based on the fact that "wreck of the sea," within the meaning of the English statutes cited above, must be "goods cast upon the land or shore", Hale's De Jure Maris, p. 37; and his opinion that Section 705.01 et seq., supra, was in apparent conflict with Section 715.01, Fla. Stat. 1955, F.S.A., vesting in the finder the title to personal property found in public places, so that the latter being the last enacted in point of time, would prevail over the former; and he concluded that "Section 705.01-705.03 cannot be regarded as overturning the settled rule of law that a wrecked ship abandoned in navigable waters becomes the property of the first taker." It was also his opinion that no grounds for enjoining the alleged trespass existed, "independently of the right of property in the sunken battleship".
We will first consider the question of the right of the sovereign at common law, to goods found wrecked or derelict at sea, regardless of whether they were "cast upon the land or shore". The rule is stated in Carver's Carriage of Goods by Sea, 9th Ed., p. 580, as follows:
"So where a ship is derelict, or where goods have been thrown out of a vessel to lighten her (jetsam), or have been sunk but tied to some floating mark to show the place (lagan) or have been washed out of the ship and remain afloat (flotsam), in those cases, also, the property belongs to the Crown in its office of Admiralty, unless the owner establishes his claim to it."
This statement is supported by the English cases on the subject. "* * * the *905 common law gave as well wreck, jetsam, flotsam, and lagan upon the sea, as estray * * *, treasure-trove, and the like to the King, because by the rule of the common law, when no man can claim property in any goods, the King shall have them by his prerogative". Sir Henry Constable's Case, 5 Coke's Report 108b, 77 Eng. Repr. 218, 223. "By the general law, all goods found afloat and derelict on the high seas belong, as droits, to the Crown, in its office of Admiralty." The King v. Forty-Nine Casks of Brandy (1836) 3 Hagg. Adm. 292, 166 Eng. Repr. 414. A wrecked vessel and its cargo, lying at the bottom of the sea, is a "derelict" which, if not claimed by the owner, at the end of a year, becomes a droit of the Crown in its office of Admiralty. H.M.S. Thetis (1835) 3 Hagg. 228, 166 Eng. Repr. 390, 391. See also the Tubantia (1924) P. 78, 91; The King v. Two Casks of Tallow (1837) 3 Hagg. Adm. 292, 166 Eng. Repr. 414; and The Aquila (1798) 1 C. Rob. 37, 165 Eng. Repr. 87, 91.
The difficulty which the Chancellor  and apparently the parties, also  has had with this question stems from a misunderstanding of the meaning and effect of the two English statutes cited above. The statute of 3 Edwards I, Ch. 4, (enacted in 1275) provides that:
"Concerning Wrecks of the Sea, it is agreed, that where a Man, a Dog, or a Cat escape quick out of the Ship, that such Ship nor Barge, nor any Thing within them, shall be adjudged Wreck; (2) but the goods shall be saved and kept by View of the Sheriff, Coroner, or the King's Bailiff, and delivered into the Hands of such as are of the Crown, where the Goods were found; (3) so that if any sue for those Goods, and after prove that they were his, or perished in his keeping, within a Year and a Day, they shall be restored to him without Delay; and if not, they shall remain to the King, and be seized by the Sheriffs, Coroners, and Bailiffs, and shall be delivered to them of the Town, which shall answer before the Justices of the Wreck belonging to the King."
The statute of 17 Edward II, Ch. 11 (enacted in 1324) provides that:
"Also the King shall have Wreck of the Sea throughout the Realm; (2) Whales and great Sturgeons taken in the Sea or elsewhere within the Realm, (3) except in certain Places privileged by the King."
These two statutes did not confer any new right upon the Crown. By the ancient Roman law and the early common law of England, the right of the sovereign to wrecked and derelict property on the seas was absolute, to the exclusion of the owner. See the note to The Aquila, supra, 165 Eng. Repr. 87, 91. But by the time of Edward I, this harsh rule had been softened and the owner could reclaim his property within a year and a day. The statute of 3 Edward I, Ch. 4, "was but a declaration of the common law against the opinion in Dr. and Stud. lib. 2 fo. 118, and if the owner dies, his executors or administrators may make their proofs." Constable's Case, supra, 77 Eng. Repr. 218, 222. Similarly, the declaration of the statute of 17 Edward II, supra, that "wreck of the sea" belonged to the King "except in certain places Privileged by the King" was "but a declaration and an affirmation of the common law. For notwithstanding that stat. being made within time of memory, a man may prescribe to have wreck, * * *" Constable's Case, supra. And, of course, the King could grant the right to "wreck of the sea" to a subject, generally to the lord of a manor bordering on the sea. In fact, most of the cases in which "wreck of the sea" or wreccum maris, has been defined were concerned with the question of ownership of shipwrecked goods, as between the Crown and the lord of the manor, where the lord is claiming ownership of the goods either under a grant of wreck or by prescription.
In short, the statute of 3 Edward I, supra, was simply a declaration of the right of an *906 owner to assert his ownership to shipwrecked goods within a year and a day  a right which already existed under the common law, not only as to technical "wreck of the sea" but also to goods of the character of flotsam, jetsam, and lagan. And the statute of 17 Edward II, supra, was merely a declaration of the privilege of acquiring a right to "wreck of the sea", in its technical sense, by prescription or usage, already existing under the common law. Constable's case, supra.
The Florida statute relevant to this particular point is Ch. 705, Fla. Stat. 1955, F.S.A., parts of which, Sections 4, 5 and 6, were enacted in 1850 as part of Ch. 344, Acts of 1850, and the remainder in 1859 as Ch. 1005, Acts of 1859, under the title "An Act for the protection and disposal of Wrecked and Derelict Goods in the State of Florida." It provides, in Section 1, that "Whenever any wrecked derelict goods, abandoned motor vehicle or other personal property shall be found in any county in this state, the county judge shall ascertain the amount and situation of the same, and by his written order shall cause the sheriff to take charge thereof and sell the same at public outcry, after giving a reasonable public notice of the time and place of such sale." Provision is made for the determination of a salvage award to be paid to the "salvors or persons finding and reporting such goods," and the balance of the proceeds of the sale (after deducting a commission to the sheriff and county judge) is to be held for the owner for "one year and a day" and thereafter paid into the state treasury, if no claimant appears. Sections 705.02 and 705.03, supra. It also provides for the punishment of any person who finds "wrecked or derelict goods and fails to report them to the county judge of the county wherein the same are found," Section 705.07, or who "secretes or appropriates the same to his own use * * *." Section 705.08. (Emphasis added.)
It should also be noted that, at the time of the enactment of Ch. 1005, Acts 1859, supra, provision had already been made for the taking up, for the benefit of the public treasury, of boats and vessels adrift, Act of Nov. 21, 1828, lumber adrift, Act of Jan. 8, 1853, now Ch. 706, Fla. Stat. 1955, F.S.A., and estrays, Act of Feb. 12, 1833, now Ch. 707, Fla. Stat. 1955, F.S.A.
So the history of these various enactments shows the intention of the State to pre-empt for itself those fiscal perquisites which, at common law, had been the prerogative right of the Crown. To interpret Ch. 705, supra, as applying only to goods which were, technically, "wreck of the sea" (that is, goods cast upon the shore) at common law, as the Company would have us do, we would have to hold that the statute, by implication, divested this state of a prerogative right of the Crown to which it succeeded when it became a sovereign state of this Union and adopted the common law of England as it existed in 1776. The statute did not do so expressly, nor is such a result necessarily implied. The statute must have been intended only to prescribe the procedure by which goods found wrecked or derelict in or upon the territorial waters of this state within the boundaries of any county of this state  whether technically "droits of admiralty" or "wreck of the sea" at common law  could be pre-empted on behalf of the state and the rights of the owner therein preserved. It had no more effect on the existing common law right of the state than did the statute of 3 Edward I, Ch. 4, supra, on the common law right of the Crown in this respect.
Nor do we think that Section 715.01, Fla. Stat. 1955, F.S.A., supra, had the effect of divesting or abrogating the state's prerogative right here in question. This statute confirms in the finder, after six months, the title to personal property found in public places; but we do not think it had the effect of abrogating the state's prerogative rights to wrecked and derelict goods of the kind here in question, any more than it divested the state and counties of their right to share in the proceeds of the sale of estrays, boats and vessels adrift, and lumber adrift, as provided for in Chs. 706 and 707, *907 supra. These rights could, of course, be divested or abrogated by statute; but unless the statute relied upon expressly so declares or unless this is a necessary inference from its provisions, we will not so interpret it. And we cannot read such a sweeping abrogation of existing governmental rights into Section 715.01, supra, which must have been intended as a declaration of the common law rights of the finder of lost property, with a limitation period of six months within which the owner would have the right to reclaim his property.
We conclude, therefore, that the wreck of the vessel is a "derelict" which, at common law, would belong to the Crown in its office of Admiralty at the end of a year and a day, under the authority of the English cases above cited; that since the property was resting in territorial waters of the State of Florida and within the boundaries of Escambia County, See Section 7.17, Fla. Stat. 1955, F.S.A., it is within the purview of the common law and Ch. 705, supra, and belongs to the State in its sovereign capacity. See also "Submerged Lands (Tidelands) Act of 1953", 67 Stat. 29, also Title 43 U.S.C.A. § 1301 et seq.
It might be noted that the administrative officers of this state have for many years so interpreted Ch. 705, supra, and related statutes. See Section 253.03, Fla. Stat. 1955, F.S.A., designating state-owned water bottoms as "state lands"; Section 821.19, Ibid., prohibiting trespass upon state lands; and Section 821.20, Ibid., defining "trespass" as, among others, "the use or removal of the soil of said land or anything except wild game in, on or under such soil, without written lease from the state." While not binding on the court, such administrative interpretations are entitled to great weight and will not be departed from by the courts unless clearly erroneous or unauthorized. Gay v. Canada Dry Bottling Co. of Florida, Inc., Fla. 1952, 59 So.2d 788, 790.
The Company states in its brief that "If the law for which the appellants contend is applied in this case, then all of the settled law, maritime and property law of the United States and literally of the world will be upset." We do not find this theory of the law to be a new and startling one. As long ago as the year 1798, in The Aquila, supra, 1 c. Rob. 37, 165 Eng. Repr. 87, 89, we find a salvor attempting to claim the title, by right of occupancy, to the cargo carried in a ship found derelict at sea, where the ship was claimed and restored to the owner and the cargo remained unclaimed. Sir W Scott, Judge of the Admiralty, said in that case:
"It is certainly very true that property may be so acquired: but the question is, to whom is it acquired? By the law of nature, to the individual finder or occupant; But in a state of civil society, although property may be acquired by occupancy, it is not necessarily acquired to the occupant himself; for the positive regulations of the State may have made alterations on the subject; and may, for reasons of public peace and policy, have appropriated it to other persons, as, for instance, to the State itself, or to its grantees.
"It will depend, therefore, on the law of each country to determine, whether property so acquired by occupancy, shall accrue to the individual finder, or to the Sovereign and his representatives? And I consider it to be the general rule of civilized countries, that what is found derelict on the seas, is acquired beneficially for the Sovereign, if no owner shall appear. Selden (De Dom, Maris, lib. i, c. 24) lays it down as a right annexed to sovereignty, and acknowledged amongst all nations ancient and modern. Loccenius (Lib. i, c. 7, 10) mentions it as an incontestable right of sovereignty in the north of Europe. Valin (Lib. iv, tit. 9, art. 26) ascribes the same right to the crown of France; and speaking of the rule in France, that a third shall be given to salvors, in cases of shipwreck, expressly applies the same rule to derelicts, as *908 standing on the same footing. In England this right is as firmly established as any one prerogative of the crown. * * *"
For the reasons stated, we hold that the State of Florida, in its sovereign capacity, has a possessory right or title to the wreck of the Massachusetts superior to that of the Company, and that the lower court erred in refusing to enter a permanent injunction against the Company's interference with such title or possession.
Accordingly, the decree appealed from should be and it is hereby
Reversed.
THOMAS, HOBSON, THORNAL and O'CONNELL, JJ., concur.
DREW, C.J., dissents.
TERRELL, J., not participating.
DREW, Chief Justice (dissenting).
Although there is serious doubt of the applicability of the King's prerogative in wreck or derelicts through Section 2.01 Florida Statutes 1955[1], F.S.A., it is not necessary to belabor the point for there are two more specific Florida Statutes to consider  Ch. 705 and Section 715.01 Florida Statutes 1955, F.S.A. The scheme of Chapter 705, supra, is first announced in Section 705.01:
"County judge to order sale.  Whenever any wrecked derelict goods, abandoned motor vehicle or other personal property shall be found in any county in this state, the county judge shall ascertain the amount and situation of the same, and by his written order shall cause the sheriff to take charge thereof and sell the same at public outcry, after giving a reasonable public notice of the time and place of such sale."
Then Section 705.02 grants a salvage to the finder out of the proceeds of the sale. Finally, Section 705.03 directs that the remaining sum, less certain costs, be held for a year and a day for the owner and if not then claimed be turned over to the state treasury.
The other statute, Section 715.01, provides:
"Title to personal property found in public places.  The title to all personal property found in or upon public conveyances, premises at the time used for business purposes, parks, places of amusement, public recreation areas and other places open to the public is hereby vested in the finder unless the same be called for or claimed by the rightful owner thereof within six months after the finding thereof."
The two statutes can be harmonized if one recognizes that the later statute, Section 715.01, operates only where personal property is found "in or upon public conveyances, premises at the time used for business purposes, parks, places of amusement, public recreation areas and other places open to the public." (Emphasis supplied.) Thus an area outside of "places open to the public" is left for the operation of Chapter 705. The facts of the present case bring it within the more specific operation of Section 715.01. I, therefore, conclude that the judgment of the circuit judge, which upholds the right of the finder against the claim of the state, is correct.

On Rehearing
ROBERTS, Justice.
After further consideration upon rehearing granted, we adhere to our former opinion *909 and judgment. See also Sec. 716.01, et seq., F.S.A.
It is so ordered.
TERRELL, C.J., and THOMAS, HOBSON, THORNAL and O'CONNELL, JJ., concur.
DREW, J., dissents.
NOTES
[1] See, Russell v. Forty Bales of Cotton, D.C.S.D.Fla. 1872, 21 Fed.Cas. page 42, No. 12,154; and see, the interpretation of Section 2.01 in Waller v. First Savings & Trust Co., 1931, 103 Fla. 1025, 1038, 138 So. 780; Banfield v. Addington, 1932, 104 Fla. 661, 140 So. 893, 899; and Ripley v. Ewell, Fla. 1952, 61 So.2d 420.