STATE OF NORTH CAROLINA, EX REL. T. WADE BRUTON, ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA, v. FLYING "W" ENTERPRISES, INC., A CORPORATION; W. L. WILDE, ROBERT T. SQUYRES, JERRY ADAMS, AND JOHN DOE, RICHARD ROE, AND ALL OTHER PERSONS THREATENING TO TRESPASS UPON THE S/S MODERN GREECE, HER ENGINES, TACKLE, APPAREL, FURNITURE OR CARGO, AND ALL OTHER VESSELS LYING WITHIN A MARINE LEAGUE OFF THE COAST OF THE STATE OF NORTH CAROLINA.

(Filed 10 April 1968.)

**1. State §§ 1, 2—**

The eastern boundary of this State is fixed at one marine league eastward from the seashore of the Atlantic Ocean bordering the State, measured from the extreme low water mark of the seashore, and the State is entitled to exercise jurisdiction over the territory within, and ownership of the lands under, the littoral waters within the boundaries of the State, subject only to the jurisdiction of the United States over navigation within the territorial waters. G.S. 141-6.

**2. Same—**

By 43 U.S.C.A. § 1312, the United States has in effect quitclaimed and confirmed the ownership of the State in lands beneath the Atlantic Ocean within a marine league seaward from the eastern boundary of the State.

**3. Admiralty—**

A marine league is a distance the equivalent of three geographical miles.

**4. Same—**

A vessel, cargo, or other property is derelict in the maritime sense of the word when it is abandoned by the owners without hope of recovery or without intention of returning, and such abandonment effectively divests the owners of title and ownership thereto.

**5. Common Law—**

The common law of England is in force in this State to the extent it is not destructive of, repugnant to, or inconsistent with our form of govern-

ment and to the extent it has not been abrogated or has not become obsolete. G.S. 4-1.

**6. Same—**

The term "common law" refers to the common law of England and not of any particular state.

**7. Admiralty—**

Under the common law, wrecks or derelicts became the property of the Crown or its grantee after a year and a day if no owner appeared within that time to claim them.

**8. Same;   State § 2—**

The submerged hulks of certain Confederate blockade runners and the wreck of a Spanish privateer sunk during the eighteenth century, together with their cargoes, all of which are resting within the territorial waters of the State and below the surface of the waters at low tide, are derelicts or wrecks within the purview of the common law and belong to the State in its sovereign capacity, and the activities of defendants in going upon the vessels and removing therefrom historical artifacts constitute a trespass, entitling the State to an order permanently enjoining defendants from disturbing the vessels or their cargoes.

**9. Trespass § 1—**

A trespass is a wrongful invasion of the possession of another.

**10. Admiralty—**

G.S. 82-1 et seq., relating to the protection and sale of stranded vessels and their cargo, are inapplicable to divest the State of its prerogative right to abandoned vessels lying beneath the territorial waters of the State for more than 100 years.

**11. State § 6;   Injunctions § 4—**

The State is entitled to an order permanently restraining diving and salvage operations by defendants to remove irreplaceable historical artifacts from sunken vessels lying within the territorial waters of the State, and the State is also entitled to a mandatory injunction to compel defendants to return such articles taken from the vessels.

HUSKINS, J., took no part in the consideration or decision of this case.

APPEAL by defendants from *Mintz, J.*, in chambers, 17 March 1967, NEW HANOVER County. Docketed and argued as Case No. 198, Fall Term 1967, and docketed as Case No. 199, Spring Term 1968.

This controversy had its inception in the diving and salvage operations conducted by defendants upon the submerged hulks of certain Confederate blockade runners sunk in the coastal waters of North Carolina during the War Between the States and in similar activities by defendants upon the wreck of a Spanish privateer sunk off the coast of North Carolina during the early years of the eighteenth century. These old derelict vessels all lie beneath the surface

of the ocean within the territorial waters of this State adjacent to the Counties of Pender, New Hanover, and Brunswick. The State of North Carolina, by its Attorney General, instituted this action to permanently enjoin defendants from proceeding with such diving and salvage operations, to command them to return to the State of North Carolina the various artifacts and objects of historical significance allegedly wrongfully taken by defendants from such wrecks, to recover damages for the alleged wrongful detention of these items, and in the event that these articles cannot be returned to recover damages from defendants of $5,000 for conversion.

A temporary restraining order requiring defendants to appear and show cause why it should not be continued to the final determination of the cause was issued *ex parte* simultaneously with the filing of the summons and the complaint. Upon the return of the order to show cause, Judge Mintz heard evidence and entered an order extending the restraining order until the final determination of the action. Defendants filed answer.

By consent of the parties, the action was heard by Judge Mintz in chambers in New Hanover County which is located in the Fifth Judicial District of which Judge Mintz is the Resident Superior Court Judge. Both parties waived trial by jury.

At the hearing the parties stipulated certain facts which are in substance as follows, except when quoted:

During March, 1962 the State of North Carolina, plaintiff, through its Department of Archives and History, supervised diving operations upon the hulks of the Confederate blockade runners S/S *Modern Greece*, S/S *Phantom*, and S/S *Ranger* "and further, undertook and conducted recovery and restoration of portions of the cargo, furniture, tackle and apparel" of these Civil War derelicts and three others known as the S/S *Venus*, the S/S *Ella Beauregard*, and the S/S *Condor*. The State of North Carolina has opened and is presently maintaining a restoration center and laboratory at Fort Fisher in New Hanover County where "plaintiff has gathered, preserved, identified, studied and maintained parts and parcels of these hulks, their cargoes, furniture, apparel, fixtures, and appliances."

Defendants Flying "W" Enterprises, Inc. (hereinafter referred to as Flying "W"), Wilde, Squyres, and five paid employees of Flying "W", on or about 15 June 1965 and without authority from the State of North Carolina, dived upon the hulk of the S/S *Modern Greece* and removed therefrom the items described as follows in paragraph 11 of plaintiff's amended complaint to which these stipulations of fact refer:

"a.  One bar of lead, value $300.00.

b.  One file, approximately 14 inches long, value $25.00.

c.  A cluster of eighteen small four-inch triangular and half-round files, value $50.00.

d.  A metal bar six feet two inches long, composed of copper tubing, value $150.00.

e.  Assorted links of copper pipes, approximately one and one-quarter inches in diameter, value $200.00.

f.  One bundle of tin-plated steel sheets, 11 inches by 14 inches, $100.00 in value.

g.  Nineteen silver-plated spoons, assorted sizes, value $100.00."

Similarly, these individuals went upon the hulks of the Spanish privateer *Fortune* (on or about 23 June 1965); the S/S *Ranger* (on or about 24 June 1965); and the S/S *Phantom* (on or about 3 July 1965). They removed only one item of personalty from the sailing vessel Fortune, to wit, "one round cannon ball." From the S/S *Ranger* they took nothing; but from the S/S *Phantom* they carried away six bars of lead valued at $1,800 and bearing the inscription *Pontifex and Wood, London,* two pieces of copper tubing valued at $150, and one brass valve.

In 1962 defendant Wilde, while a member of the United States Marine Corps stationed at Camp Lejeune, North Carolina, dived upon and explored the hulk of the S/S *Modern Greece* at about the same time that the State, as mentioned above, was conducting its recovery and restoration operations thereon.

All the items of personal property removed by defendants from these derelict vessels "are historical artifacts, each possessing special and peculiar value rendering their loss irreparable in monetary damage."

All the hulks or wrecks herein involved, together with all the property in or upon them, "lie in the Atlantic Ocean, below the surface of the water at low tide, within a marine league seawardly from the Coast of North Carolina, offshore from the waters of Pender, New Hanover and Brunswick Counties, North Carolina."

These wrecks, the property in or upon them, and the property removed by defendants "have never been reclaimed by the original owners thereof, nor have the original owners thereof ever . . . made an attempt to salvage the same since each hulk was wrecked. . . ."

The court, upon consideration of the pleadings, the stipulations, and the argument of counsel, recited in the judgment its initial findings respecting the capacity of the State to sue in its own courts; the authority of the Attorney General, as Relator, to bring this suit; the due corporate existence of Flying "W" under the laws of this State; the status of defendants Wilde, Squyres, and Adams as directors of that corporation; and the usual preliminary findings relating to jurisdiction over the parties and subject matter. The court then proceeded to recite in the judgment its findings of fact which are in substance as follows, except when quoted:

All of these old derelict vessels, together with their "engines, tackle, apparel, furniture, and cargoes," since the dates of their sinking, have lain submerged within the territorial waters of the State of North Carolina unattended and abandoned by their former owners. The sailing vessel *Fortune,* at one time owned by Spain, was sunk during the early 1700's in the Cape Fear River several hundred feet eastward from the western bank of that river near what used to be Fort Anderson, and she now lies in that vicinity on the floor of the Cape Fear River. The S/S *Modern Greece* was sunk in 1862 and lies on the floor of the Atlantic Ocean, in six or seven fathoms of water, about three hundred yards off the beach immediately south of the Air Force Radar Station at Fort Fisher in New Hanover County. The S/S *Ranger* was sunk in 1864 and lies on the floor of the Atlantic about three hundred yards off the coast immediately west of Lockwood Folly Inlet in Brunswick County. The S/S *Phantom* was sunk in 1863 and lies on the ocean floor approximately two or three hundred yards off the coast immediately north of Rich's Inlet in Pender County.

At this point in his findings of fact, Judge Mintz recited facts substantially similar to those agreed to and stipulated by the parties which have been outlined above.

The recitation in the judgment of facts found by the court then continued in substance as follows, except when quoted:

The items specified above as taken from the S/S *Modern Greece* and those designated as removed from the *Phantom* were carried away from those wrecks by defendants Flying "W", W. L. Wilde, Robert T. Squyres, and Tommy Gene Barton "with the intention of converting the same to the use of defendant Flying "W". . . ."

At the time this action was instituted, these defendants intended "to continue their diving and salvage operations aboard the hulks of the S/S *Modern Greece,* the S/S (*sic*) *Fortune,* the S/S *Ranger* and the S/S *Phantom* and many other wrecks within the territorial waters of the State of North Carolina in the Atlantic Ocean within

a marine league seaward from the eastern bank and Coast of the State of North Carolina, unless permanently enjoined from so doing."

A continuation of the diving and salvage operations by defendants upon wrecks within the territorial waters of the State of North Carolina and in the Atlantic Ocean within a marine league seaward from the coast of the State of North Carolina, will result in irreparable loss and damage to the State of North Carolina.

At the end of these findings of fact the judgment recites the following issue which was submitted to the court and answered by it as indicated below:

"Is the plaintiff the owner and entitled to the immediate possession of the sunken hulks and all property thereon or therein, including those hulks and artifacts specifically described in the Complaint, lying in the Atlantic Ocean seaward within one marine league of the North Carolina coast, as alleged in the Complaint?

"ANSWER: Yes."

The court's conclusions of law appear at this point in the judgment and are in substance as follows:

(1) The State of North Carolina has never abandoned the wrecks of the S/S *Modern Greece,* the S/S *Phantom,* the S/S *Ranger,* and the Spanish privateer *Fortune,* their engines, tackle, apparel, furniture, and cargoes, nor the wrecks of any other ships lying in the Atlantic Ocean within the territorial waters of the State of North Carolina and within a marine league seaward from the coast of North Carolina.

(2) The diving and salvage operations conducted by the individual defendants, the corporate defendant and its servants, agents, and employees, upon the wrecks of the aforesaid vessels constituted unlawful trespasses by them, jointly and severally.

(3) Plaintiff is entitled to injunctive relief enjoining the individual defendants, the corporate defendants and its officers, agents, servants, and employees from in any way diving upon, going on, or molesting the wrecks of the vessels aforesaid, which have lain unattended since the Civil War in the Atlantic Ocean within the territorial waters of the State of North Carolina, seaward within one marine league of the North Carolina coast.

(4) The State of North Carolina has waived all claims for monetary damages against defendants upon the stipulation that those defendants return to the plaintiff the following described items:

"a. One bar of lead.

b. One file, approximately 14 inches long.

c. A cluster of eighteen small four-inch triangular and half-round files.

d. A metal bar six feet two inches long, composed of copper tubing.

e. Assorted links of copper pipes, approximately one and one-quarter inches in diameter.

f. One bundle of tin-plated steel sheets, 11 inches by 14 inches.

g. Nineteen silver-plated spoons, assorted sizes.

h. Six bars of lead, bearing the inscription, Pontifex and Wood, London.

i. Two pieces of copper tubing and one brass valve."

(5) Defendants should be ordered to return the above-described articles to the State of North Carolina at its archeological site at Fort Fisher, North Carolina.

Whereupon, the court ordered and decreed that the individual defendants, the corporate defendant, as well as its officers, agents, servants, and employees, be permanently enjoined from diving upon, going on, or molesting the wrecks of the S/S *Modern Greece,* the Spanish privateer *Fortune,* the S/S *Ranger,* the S/S *Phantom,* their engines, tackle, furniture, apparel, and cargoes, and all other wrecks which have lain unattended since the Civil War in the Atlantic Ocean within the territorial waters of the State of North Carolina within a marine league seaward of the coast of the State of North Carolina. It was further ordered that defendants shall forthwith return to the State of North Carolina at its archeological site at Fort Fisher, North Carolina, those items listed above in Judge Mintz's fourth conclusion of law.

From the judgment entered, defendants appeal.

*Poisson & Barnhill by L. J. Poisson, Jr., for defendant appellants.*
*Attorney General T. W. Bruton, Assistant Attorney General Parks H. Icenhour, and Rountree & Clark by George Rountree, III, for plaintiff appellee.*

PARKER, C.J. Defendants have not excepted to any findings of fact except the finding of fact that a continuation of the diving and salvage operation of the defendants will result in irreparable loss and damage to the State of North Carolina. A number of facts were

stipulated by the parties. The parties stipulated in substance that all the hulks or wrecks of the vessels herein involved, together with all the property in and upon them, "lie in the Atlantic Ocean, below the surface of the water at low tide, within a marine league seawardly from the Coast of North Carolina, offshore from the waters of Pender, New Hanover and Brunswick Counties, North Carolina." Under this stipulation of fact, all the hulks or wrecks herein involved, together with all the property in and upon them, lie within the territorial boundaries of the State of North Carolina and have substantially so lain since they were sunk, except the Spanish sailing vessel *Fortune* which, with its cargo therein, was sunk in the early 1700's and has substantially lain in the same position since it was sunk.

G.S. 141-6 (a) and (b) read:

> "(a) The Constitution of the State of North Carolina, adopted in 1868, having provided in article I, § 34, that the 'limits and boundaries of the State shall be and remain as they now are,' and the eastern limit and boundary of the State of North Carolina on the Atlantic seaboard having always been, since the Treaty of Peace with Great Britain in 1783 and the Declaration of Independence of July 4th, 1776, one marine league eastward from the Atlantic seashore, measured from the extreme low water mark, the eastern boundary of the State of North Carolina is hereby declared to be fixed as it has always been at one marine league eastward from the seashore of the Atlantic Ocean bordering the State of North Carolina, measured from the extreme low water mark of the Atlantic Ocean seashore aforesaid.

> "(b) The State of North Carolina shall continue as it always has to exercise jurisdiction over the territory within the littoral waters and ownership of the lands under the same within the boundaries of the State, subject only to the jurisdiction of the federal government over navigation within such territorial waters."

See North Carolina Constitution of 1776, Declaration of Rights § 25.

By statute the United States has in effect quitclaimed and confirmed the ownership of the State of North Carolina in the lands beneath the Atlantic Ocean within a marine league seaward from the eastern boundary of the State. 43 U.S.C.A. § 1312 reads:

> "The seaward boundary of each original coastal State is ap-

proved and confirmed as a line three geographical miles distant from its coast line or, in the case of the Great Lakes, to the international boundary. Any State admitted subsequent to the formation of the Union which has not already done so may extend its seaward boundaries to a line three geographical miles distant from its coast line, or to the international boundaries of the United States in the Great Lakes or any other body of water traversed by such boundaries. Any claim heretofore or hereafter asserted either by constitutional provision, statute, or otherwise, indicating the intent of a State so to extend its boundaries is approved and confirmed, without prejudice to its claim, if any it has, that its boundaries extend beyond that line. Nothing in this section is to be construed as questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws prior to or at the time such State became a member of the Union, or if it has been heretofore approved by Congress. May 22, 1953, c. 65, Title II, § 4, 67 Stat. 31."

A marine league is a distance which is the equivalent of three geographical miles. Ballentine's Law Dictionary (2nd Ed. 1948).

Defendants assign as error that Judge Mintz in answering the issue set forth above "yes" held in effect that the plaintiff is the owner and entitled to the immediate possession of the sunken hulks and all property thereon or therein, including those hulks and artifacts specifically described in the complaint, lying in the Atlantic Ocean seaward within one marine league of the North Carolina coast, as alleged in the complaint. Defendants also assign as error the court's conclusion of law that the State of North Carolina has never abandoned the wrecks of the S/S *Modern Greece,* the S/S *Phantom,* the S/S *Ranger* and the Spanish privateer *Fortune,* and the articles contained therein, nor the wrecks of any other ships, lying in the Atlantic Ocean within the territorial waters of the State of North Carolina and within a marine league seaward from the Coast of North Carolina.

It is well-settled law that the owners of sunken or derelict vessels or their contents may abandon them so effectively as to divest title and ownership. *Thompson v. United States,* 62 Ct. Cl. 516; *Eads v. Brazelton,* 22 Ark. 499, 79 Am. Dec. 88; *Howard v. Sharlin* (Fla.), 61 So. 2d 181; *State by Ervin v. Massachusetts Co.* (Fla.), 95 So. 2d 902, 63 A.L.R. 2d 1360; *Creevy v. Breedlove,* 12 La. Ann. 745; *Steinbraker v. Crouse,* 169 Md. 453, 182 A. 448; *Deklyn v. Davis,*

1 Hopk. Ch. 135, 2 N.Y. Ch. 369; *Williamson v. Mennella*, 248 App. Div. 911, 290 N.Y.S. 645; Annot., 63 A.L.R. 2d 1369, 1372.

"A vessel, cargo, or other property is derelict in the maritime sense of the word when it is abandoned without hope of recovery or without intention of returning." 48 Am. Jur., Shipping § 647 at p. 451. It is manifest from the stipulations and the findings of fact made by the judge, which findings of fact relevant here are unchallenged, that the vessels herein involved were derelicts, and that the one-time owners of these submerged vessels and their contents have abandoned them so effectively that they, and each one of them, have divested themselves of any title and ownership.

Defendants contend the State of North Carolina has no property rights in these sunken vessels or their cargoes either under the early English common law or under the subsequent law of the State of North Carolina prior to the enactment of Chapter 533, Session Laws of 1967 (now codified as G.S. 121-22 through G.S. 121-28). Defendants in their brief contend in essence that these vessels and their cargoes were abandoned by their former owners, and that ownership has vested in defendants because they have lawfully· appropriated them to their own use and reduced them to possession with the requisite intent to become the owners.

We will first consider the question of the right of the sovereign at common law to goods found wrecked or derelict at sea, regardless of whether they were "cast upon the land or shore."

The Supreme Court of Florida, *en banc*, dealt with this precise question in *State by Ervin v. Massachusetts Co.* (Fla.), 95 So. 2d 902, 63 A.L.R. 2d 1360. In a very scholarly opinion, Justice Roberts said for the Court:

> "The rule is stated in Carver's Carriage of Goods by Sea, 9th Ed., p. 580, as follows:
>
> " 'So where a ship is derelict, or where goods have been thrown out of a vessel to lighten her (jetsam), or have been sunk but tied to some floating mark to show the place (lagan) or have been washed out of the ship and remain afloat (flotsam), in those cases, also, the property belongs to the Crown in its office of Admiralty, unless the owner establishes his claim to it.'
>
> "This statement is supported by the English cases on the subject. '. . . the common law gave as well wreck, *jetsam, flotsam*, and *lagan* upon the sea, as estray. . . ., treasure-trove, and the like to the King, because by the rule of the common law, when no man can claim property in any goods, the King shall have them by his prerogative.' *Sir Henry Constable's Case*, 5

Coke's Report 108b, 77 Eng. Repr. 218, 223. 'By the general law, all goods found afloat and derelict on the high seas belong, as droits, to the Crown, in its office of Admiralty.' *The King v. Forty-Nine Casks of Brandy* (1836), 3 Hagg Adm. 292, 166 Eng. Repr. 414. A wrecked vessel and its cargo, lying at the bottom of the sea, is a 'derelict' which, if not claimed by the owner, at the end of a year, becomes a *droit* of the Crown in its office of Admiralty. H. M. S. Thetis (1835), 3 Hagg 228, 166 Eng. Repr. 390, 391. See also the Tubantia (1924), P. 78, 91; *The King v. Two Casks of Tallow* (1837), 3 Hagg Adm. 292, 166 Eng. Repr. 414; and *The Aquila* (1798), 1 C. Rob. 37, 165 Eng. Repr. 87, 91.

"The difficulty which the Chancellor — and apparently the parties, also — has had with this question stems from a misunderstanding of the meaning and effect of the two English statutes cited above. The statute of 3 Edward I, Ch. 4, (enacted in 1275) provides that:

" 'Concerning Wrecks of the Sea, it is agreed, that where a Man, a Dog, or a Cat escape quick out of the Ship, that such Ship nor Barge, nor any Thing within them, shall be adjudged Wreck; (2) but the goods shall be saved and kept by View of the Sheriff, Coroner, or the King's Bailiff, and delivered into the Hands of such as are of the Crown, where the Goods were found; (3) so that if any sue for those Goods, and after prove that they were his, or perished in his keeping, within a Year and a Day, they shall be restored to him without Delay; and if not, they shall remain to the King, and be seized by the Sheriffs, Coroners, and Bailiffs, and shall be delivered to them of the Town, which shall answer before the Justices of the wrecks belonging to the King.'

"The statute of 17 Edward II, Ch. 11 (enacted in 1324) provides that:

" 'Also the King shall have Wreck of the Sea throughout the Realm; (2) Whales and great Sturgeons taken in the Sea or elsewhere within the Realm, (3) except in certain Places, privileged by the King.'

"These two statutes did not confer any new right upon the Crown. By the ancient Roman law and the early common law of England, the right of the sovereign to wrecked and derelict property on the seas was absolute, to the exclusion of the owner. See the note to *The Aquila, supra,* 165 Eng. Repr. 87, 91. But by the time of Edward I, this harsh rule had been softened and the owner could reclaim his property within a year and a day.

The statute of 3 Edward I, Ch. 4, 'was but a declaration of the common law against the opinion in Dr. and Stud. lib. 2 fo. 118, and if the owner dies, his executors or administrators may make their proofs.' *Constable's Case, supra,* 77 Eng. Repr. 218, 222. Similarly, the declaration of the statute of 17 Edward II, *supra,* that 'wreck of the sea' belonged to the King 'except in certain places Privileged by the King' was 'but a declaration and an affirmation of the common law. For notwithstanding that stat. being made within time of memory, a man may prescribe to have wreck, * * *' *Constable's Case, supra.* And, of course, the King could grant the right to 'wreck of the sea' to a subject, generally to the lord of a manor bordering on the sea. In fact, most of the cases in which 'wreck of the sea' or *wreccum Maris,* has been defined were concerned with the question of ownership of shipwrecked goods, as between the Crown and the lord of the manor, where the lord is claiming ownership of the goods either under a grant of wreck or by prescription.

"In short, the statute of 3 Edward I, *supra,* was simply a declaration of the right of an owner to assert his ownership to shipwrecked goods within a year and a day — a right which already existed under the common law, not only as to technical 'wreck of the sea' but also to goods of the character of *flotsam, jetsam,* and *lagan.* And the statute of 17 Edward II, *supra,* was merely a declaration of the privilege of acquiring a right to 'wreck of the sea,' in its technical sense, by prescription or usage, already existing under the common law. *Constable's Case, supra.*"

A rehearing was granted by the Supreme Court of Florida in this case on 12 June 1957 and, upon further consideration, it adhered to its former opinion and judgment. 95 So. 2d 908, 63 A.L.R. 2d 1369. Thereupon, defendant Massachusetts Co. petitioned the United States Supreme Court for *certiorari,* which was denied 25 November 1957, 355 U.S. 881, 2 L. Ed. 2d 112.

This is said in 1 Blackstone's Commentaries on the Laws of England, Ch. 8, p. 280 (Reprint of the First Edition, Dawsons of Pall Mall, London, 1966):

"Another maritime revenue, and founded partly upon the same reason [that is, grounded on the consideration of the King's guarding and protecting the seas from pirates and robbers], is that of shipwrecks; which are also declared to be the king's property by the same prerogative statute 17 Edw. II, c. 11. and were so, long before, at the common law."

In *Hetfield v. Baum,* 35 N.C. 394, Justice Pearson said for the Court:

> "The sovereign has a right to wrecks and all property stranded on the sea beach, and in many countries this right is exercised so as to be a source of considerable revenue.
>
> "North Carolina has a sea-coast great in extent and very dangerous, and there are probably more wrecks upon her coast during the year than upon that of any five of the other states. . . ."

In 80 C.J.S. Shipping § 258, it is said:

> " 'Wreck' has been defined to be such goods as after a shipwreck are cast on land by the sea and left there, and as the ruins of a ship which has been stranded or dashed on a shelf, rock, or lee shore by tempestuous weather, . . ."

"In England, by the early common law, all wreck or wrecks (in the technical sense) became the property of the Crown or its grantee after a year and a day, if no owner appeared within that time to claim it." 48 Am. Jur. Shipping § 648. To the same effect, 80 C.J.S. Shipping § 259.

The General Assembly in 1778, Ch. 133, P. R., enacted this statute:

> "*Be it enacted, &c.* That all such statutes, and such parts of the common law, as were heretofore in force and use within this territory, (b) and all the acts of the late general assemblies thereof, or so much of the said statutes, common law, and acts of assembly, as are not destructive of, repugnant to, or inconsistent with the freedom and independence of this State, and the form of government therein established, and which have not been otherwise provided for, in the whole or in part, not abrogated, repealed, expired, or become obsolete, are hereby declared to be in full force within this state."

This statute in its present form is codified in G.S. 4-1 as follows:

> "Common law declared to be in force. — All such parts of the common law as were heretofore in force and use within this State, or so much of the common law as is not destructive of, or repugnant to, or inconsistent with, the freedom and independence of this State and the form of government therein established, and which has not been otherwise provided for in

whole or in part, not abrogated, repealed, or become obsolete, are hereby declared to be in full force within this State."

This Court said in *Development Co. v. Parmele*, 235 N.C. 689, 71 S.E. 2d 474:

"Previously the General Assembly of North Carolina, beginning in 1711, had enacted statutes declaring that 'the common law is, and shall be in force in this government.' See Laws of N. C. 1711, Chap. 1, Sec. III (Published in Vol. 25 The State Records of North Carolina by Clark), Laws of N. C. 1715, Chap. 31, Sec. VI, Laws of N. C. 1715, Chap. 66, Sec. VIII, Laws of N. C. 1749, Chap. 1, Sec. VI, Laws of 1777 (First Session) Chap. 25, Laws of 1777 (Second Session) Chap. XIV, Sec. II, Laws of N. C. 1778 (First Session) Chap. V, Sec. II."

The term "Common Law" refers to the common law of England and not of any particular state. *Eidman v. Martinez*, 184 U.S. 578, 46 L. Ed. 694.

Defendants rely strongly upon the case of *Murphy v. Dunham* (1889, D. C. Mich.), 38 F. 503. The concept of the sovereign's prerogative as to a derelict ship or cargo apparently has been rejected expressly in this case. The Federal District Court in Michigan held, in the absence of statute, that the ownership of a cargo of coal in a vessel sunk in Lake Michigan did not pass to the State of Illinois as sovereign. The Court reasoned as follows: The Statute of Westminster (3 Edw. I. c. 4), which it held to be expressive of the common law upon the subject, applied only to "wreck of the sea" consisting of goods cast upon the shore, and goods known as *flotsam, jetsam, and lagan; flotsam* being goods cast upon the water, *jetsam* being goods cast overboard to save a laboring ship, and *lagan* being goods cast overboard attached to a line and buoy to mark their presence. The Court held that under these definitions coal lying at the bottom of the lake could not be considered "wreck of the sea" such as would be a prerogative of the sovereign. In the annotation in 63 A.L.R. 2d 1377, it is said:

"It should be noted, however, that the decision in this case can be rested on the ground that the cargo of coal had never been abandoned by its purchaser. The court also disposed of the contention that ownership of the coal had passed to the United States by noting that the sovereignty of the State of Illinois extended to the waters in which the ship had sunk, the United States at that time having only rights of control over commerce and navigation."

Defendants contend as follows:

"At the dates of the sinking and abandonment, the Merchant Shipping Act of 1854 (17 & 18 Vict. c. 104) was in effect in England, and it was not until the enactment of the Merchant Shipping Act of 1894 (57 & 58 Vict. c. 60) that the term 'wreck' at common law was extended to apply to any vessel or its cargo not thrown upon the shore."

In the case of *H. M. S. "Thetis"* (1835), 3 Hagg. 228, 166 Eng. Repr. 390, 393, the Court said:

"Now derelicts are *prima facie* droits; they are so till a claim is allowed; they do not become actual droits until a year has expired without such a claim, and until then they are only derelicts. This treasure, though it never becomes a droit, was a derelict; it was out of the possession of any person in right of the owner — *it was at the bottom of the sea and fished up from it;* and there was no doubt in the mind of anyone who sat in the Court of Appeal that it was a derelict; but within the time prescribed by law, the owners or their representatives appeared and claimed the property, and upon proof of ownership it was restored to them, — but subject to salvage, and the salvage is in respect of monies arising out of derelict." (Emphasis supplied.)

As long ago as the year 1798, in *The "Aquila,"* 1 C. Rob. 37, 165 Eng. Repr. 87, we find the salvor attempting to claim title by right of occupancy to the cargo carried in a ship found derelict at sea, where the ship was reclaimed and restored by the owner and the cargo remained unchanged. The learned and distinguished Admiralty Judge, Sir W. Scott, in this case said:

"It is certainly very true that property may be so acquired: but the question is, to whom is it acquired? By the law of nature, to the individual finder or occupant: But in a state of civil society, although property may be acquired by occupancy, it is not necessarily acquired to the occupant himself; for the positive regulations of the State may have made alterations on the subject; and may, for reasons of public peace and policy, have appropriated it to other persons, as, for instance, to the State itself, or to its grantees.

"It will depend, therefore, on the law of each country to determine, whether property so acquired by occupancy, shall accrue to the individual finder, or to the Sovereign and his representa-

tives? And I consider it to be the general rule of civilized countries, that what is found derelict on the seas, is acquired beneficially for the Sovereign, if no owner shall appear. Selden (*De Dom. Maris,* lib. i, c. 24) lays it down as a right annexed to sovereignty, and acknowledged amongst all nations ancient and modern. Loccenius (Lib. i, c. 7, 10) mentions it as an incontestable right of sovereignty in the north of Europe. Valin (Lib. iv, tit. 9, art. 26) ascribes the same right to the crown of France; and speaking of the rule in France, that a third shall be given to salvors, in cases of shipwreck, expressly applies the same rule to derelicts, as standing on the same footing. In England this right is as firmly established as any one prerogative of the crown.' . . ."

We do not accept the statement in *Murphy v. Dunham, supra,* as a correct statement of applicable common law, nor do we agree with the contention of defendants that "it was not until the enactment of the Merchant Shipping Act of 1894 (57 & 58 Vict. c. 60) that the term 'wreck' at common law was extended to apply to any vessel or its cargo not thrown upon the shore." *State by Ervin v. Massachusetts Co., supra.*

We conclude that the hulks or vessels and the cargoes therein involved in the instant case were "derelicts" which, at common law, would belong to the Crown in its office of Admiralty at the end of a year and a day under the authority of the English cases we have quoted above from the Supreme Court of Florida, and of *The "Aquila,"* *supra.* The North Carolina statutes which we have quoted above declaring the common law to be in force in this State since 1776 show the intention of the State to pre-empt for itself those fiscal prerequisites which, at common law, had been the prerogative right of the Crown. Consequently, since these hulks or vessels and the cargoes therein were resting in territorial waters of the State of North Carolina and within the boundaries of the State of North Carolina, they are within the purview of the common law and belong to the State in its sovereign capacity.

The parties stipulated as follows:

"That during March, 1962, the plaintiff State of North Carolina, through its Department of Archives and History, supervised diving upon the hulks of the *Modern Greece,* the *Phantom,* and the *Ranger,* and further, undertook and conducted recovery and restoration of portions of the cargo, furniture, tackle and apparel from the *Modern Greece,* as appears by an inventory

of relics recovered from sunken Confederate blockade runners, a copy of which is attached. (Labeled Appendix One, pages one through seven.) (Appendix One listed various items removed from the *Modern Greece, Ranger, Venus, Ella Beauregard, Phantom,* and *Condor.*) And that the State undertook and conducted recovery and restoration of certain articles from the *Phantom* and from the *Ranger,* which articles are also described in the appendix attached to these stipulations; and that the plaintiff has opened and is presently maintaining a restoration center and laboratory at Fort Fisher, New Hanover County, North Carolina, in which the plaintiff has gathered, preserved, identified, studied and maintained parts and parcels of these hulks, their cargoes, furniture, apparel, fixtures and appliances."

According to the stipulation of facts and the facts found by the judge, which are unchallenged in respect to this point, it is our opinion, and we so hold, that the sovereign State of North Carolina has never abandoned the hulks or sunken vessels herein involved, nor the property in or upon them.

The two assignments of error above mentioned are overruled.

Defendants assign as error the court's finding that the diving and salvaging operations conducted and performed by defendants on the wrecks of the S/S *Modern Greece,* the Spanish privateer *Fortune,* the S/S *Ranger,* and the S/S *Phantom* constitute unlawful trespasses by them, jointly and severally. This assignment of error is overruled. For the reason stated above, we hold that the State of North Carolina, in its sovereign capacity, has a possessory right or title to these hulks or vessels and their cargoes; and, consequently, the defendants, in going upon them and removing objects therefrom, were trespassers. It is hornbook law that to trespass is a wrongful invasion of the possession of another. 4 Strong, N. C. Index, Trespass, § 1.

Defendants assign as error that the court erred in its finding of fact that a continuation of defendants' activities in and upon the hulks of these sunken vessels will result in irreparable loss and damage to the State of North Carolina. Defendants also assign as error the granting of the State's request for injunctive relief.

According to the stipulated facts, these old derelict vessels, with the exception of the Spanish privateer *Fortune,* were once Confederate blockade runners, sunk over a century ago during the War Between the States; and, since that time, they have lain at the bottom of the sea within the territorial waters of the sovereign State of North Carolina abandoned by their one-time owners. These sunken vessels contain articles of unique historical significance and value which cannot be replaced. No reasonable redress at law can be af-

forded for defendants' taking of these artifacts, and the sovereign State of North Carolina, in equity and good conscience, should not be required to submit to the defendants' unlawfully going upon its property and removing therefrom such articles. Under the facts stipulated and found, defendants are not engaged in any legitimate enterprise with respect to these old derelicts.

The Honorable James Sprunt, a distinguished citizen of this State, one of its more prominent businessmen and a longtime resident of New Hanover County, at the age of 17½ years, sailed on the blockade runners *Advance, Eugenie, Northheath, Lillian, Susan, Beirne,* and the *Alonzo* in the capacity of purser. The historical value and rare interest which these old derelict vessels may have for future generations who are interested in days long past have been expressed by Mr. Sprunt in his accurate and most interesting volumes, *Chronicles of the Cape Fear River,* 1660 - 1916, and *Derelicts,* 1920. We quote from page 396 of the Second Edition of *Chronicles of the Cape Fear River,* speaking of these blockade runners:

> "Some of the steamers which were run ashore by the blockaders may still be seen: the *Ella* on Baldhead, the *Spunky* and the *Georgiana McCall* on Caswell Beach, the *Hebe* and the *Dee* between Wrightsville and Masonboro. The *Beauregard* and the *Venus* lie stranded on Carolina Beach; the *Modern Greece,* near New Inlet; the *Antonica,* on Frying Pan Shoals. Two others lie near Lockwood's Folly Bar; and others whose names are forgotten, lie half-buried in sands, where they may remain for centuries to come."

And at page 461 of the same book, Mr. Sprunt goes on to say:

> "After a heavy storm on the coast, the summer residents at Carolina Beach and Masonboro Sound have occasionally picked up along the shore some interesting relics of blockade times which the heaving ocean has broken from the buried cargoes of the *Beauregard, Venus, Hebe,* and *Dee.* Tallow candles, Nassau bacon, soldiers' shoes, and other wreckage comprise in part this flotsam yielded up by Neptune after nearly fifty years' soaking in the sea."

Mr. Sprunt, in his book *Derelicts,* 1920, in speaking of blockade runners, has this to say on page 51:

> "For many years the summer visitors on Wrightsville Beach have looked out upon the hurrying swell of the broad Atlantic and have felt the fascination of the long lines of crested breakers

like Neptune's racers charging and reforming for the never-ending fray; and, when the unresting tide receded, they have seen the battered hulks of some of the most beautiful ships that ever shaped a course for Wilmington in the days of the Southern Confederacy. They represented an epoch that is unique in our country's history, for, in the modern art of war the conditions which then prevailed can never occur again."

The "wrecks" statutes of North Carolina, G.S. 82-1 through 82-18, both inclusive, do not refer in any way to the ownership of the hulks or sunken vessels here and the cargoes therein contained. These statutes are concerned with the protection and sale of stranded vessels or a vessel's cargo or material or any property cast ashore, and the application of the proceeds. According to all the facts stipulated and found, these hulks or sunken vessels and their cargoes have lain unattended and abandoned for more than one hundred years beneath the surface of the Atlantic Ocean within the territorial limits of the State of North Carolina, except for the Spanish privateer *Fortune* which has lain for more than two hundred fifty years beneath the surface of the Atlantic Ocean in the territorial limits of the State of North Carolina. In this case we are not concerned with property which Blackstone says is distinguished "by the barbarous and uncouth appellations of *jetsam, flotsam,* and *ligan.*" It is manifest that no attempt has been made or will be made to salvage these sunken vessels, and it is equally manifest that the sunken vessels here have little, if any, value for salvage. In recent years since the advent of skin divers and oxygen tanks which may be strapped to the backs of skin divers, it is possible to explore such sunken vessels with no great difficulty and carry to shore articles of unique historical value found therein. It is manifest that the activities of the defendants here were solely for their own personal gain. Upon the facts stipulated and found, we do not think that our "wrecks" statutes divested this State of a prerogative right of the Crown to which it succeeded when it became a sovereign State and adopted the common law of England as it existed in 1776. In our opinion, and we so hold, our "wrecks" statutes have no application to the facts in the present case.

Upon the stipulated facts and facts found, which are not challenged except in one respect heretofore stated, the trial court correctly entered an order permanently enjoining defendants from diving upon, going on, molesting, or in anywise interfering with the hulks or sunken vessels here and their cargoes, and the court also was correct in issuing a mandatory injunction that defendants shall forthwith return to the sovereign State of North Carolina the articles

specified above which were taken from these hulks or sunken vessels. All defendants' assignments of error are overruled.

The judgment below is

Affirmed.

HUSKINS, J., took no part in the consideration or decision of this case.