SUSIE HALL v. ROSE POST AND THE POST PUBLISHING COMPANY, INC., D/B/A THE SALISBURY POST AND MARY H. HALL v. ROSE POST AND THE POST PUBLISHING COMPANY, INC., D/B/A THE SALISBURY POST

No. 340PA87

(Filed 6 October 1988)

**Privacy § 1— truthful disclosure of private facts—not recognized**

The Court of Appeals improperly reversed the trial court's granting of summary judgment for defendants in an action for tortious invasion of privacy by truthful public disclosure of private facts arising from a series of newspaper articles regarding a search for Susie Hall by her natural mother, a carnival worker who had abandoned her seventeen years earlier. This branch of the invasion of privacy tort, which has not been recognized in North Carolina, would duplicate or overlap other torts, such as intentional infliction of emotional distress, and is constitutionally suspect because it directly confronts the freedoms of speech and press.

Justice FRYE concurring in the result.

Justice MEYER joins in this concurring opinion.

ON discretionary review of the decision of the Court of Appeals, 85 N.C. App. 610, 355 S.E. 2d 819 (1987), reversing summary judgment entered by *Fountain, J.,* on 20 May 1986 in Superior Court, LINCOLN County. Heard in the Supreme Court on 11 November 1987.

*Palmer, Miller, Campbell & Martin, P.A., by Joe T. Millsaps, for plaintiff-appellees.*

*Adams, McCullough & Beard, by H. Hugh Stevens, Jr., Steven J. Levitas and Pope McCorkle, III; and Woodson, Linn, Sayers, Lawther & Short, by Donald D. Sayers, for defendant-appellants.*

*Smith, Helms, Mulliss & Moore, by E. Osborne Ayscue, Jr., Jonathan E. Buchan and James G. Middlebrooks, for The Knight Publishing Company and The North Carolina Press Association, Inc., amici curiae.*

*Tharrington, Smith & Hargrove, by Wade H. Hargrove and Mark J. Prak, for The North Carolina Association of Broadcasters, Inc., The Radio-Television News Directors Association of the Carolinas, The Associated Press, The News and Observer Publishing Company, Wilmington Star-News, Inc., Hendersonville Newspaper Corporation, The Dispatch Publishing Company, and TSP Newspapers, Inc., amici curiae.*

*Womble, Carlyle, Sandridge & Rice, by Charles F. Vance, Jr., and W. Andrew Copenhaver, for Piedmont Publishing Company, amicus curiae.*

*Haywood, Denny, Miller, Johnson, Sessoms & Patrick, by George W. Miller, Jr., for The Durham Herald Company, Inc., amicus curiae.*

*Smith, Helms, Mulliss & Moore, by Alan W. Duncan, for The Greensboro News & Record, Inc., amicus curiae.*

MITCHELL, Justice.

In the present case, this Court must decide whether claims for tortious invasion of privacy by truthful public disclosure of "private" facts concerning the plaintiffs are cognizable at law in North Carolina. We hold that they are not and reverse the decision of the Court of Appeals.

The plaintiffs, Susie Hall and her adoptive mother, Mary Hall, brought separate civil actions against the defendants for invasion of privacy. The actions were based upon two articles printed in The Salisbury Post and written by its special assignment reporter, Rose Post. The defendants answered asserting among other things that each plaintiff's complaint failed to state a claim upon which relief could be granted. The defendants moved for summary judgment in both actions, and a consolidated hearing was held on their motions. The trial court entered summary judgment for the defendants in both cases on 20 May 1986.

The plaintiffs' cases were consolidated for purposes of appeal. The Court of Appeals concluded that summary judgment for the defendants had been improperly granted and reversed the trial court. On 23 June 1987, the defendants petitioned this Court for discretionary review of the decision of the Court of Appeals. On 28 July 1987, we allowed discretionary review.

The pleadings and affidavits forming the forecast of evidence at the hearing on the defendants' motions for summary judgment tended to establish that, on 18 July 1984, The Salisbury Post published an article by Rose Post which bore the headline "Ex-Carny Seeks Baby Abandoned 17 Years Ago." The article concerned the search by Lee and Aledith Gottschalk for Aledith's daughter by a previous marriage, whom she and her former husband had abandoned in Rowan County in September of 1967. The article told of Aledith's former marriage to a carnival barker named Clarence Maxson, the birth of their daughter in 1967, their abandonment of the child at the age of four months, events in Aledith's life thereafter, and her return to Rowan County after seventeen years to look for the child. The article indicated that Clarence Maxson had made arrangements in 1967 for a babysitter named Mary Hall to keep the child for a few weeks. Clarence and Aledith then moved on with the carnival, and Clarence later told Aledith that he had signed papers authorizing the baby's adoption.

Aledith was married to Lee Gottschalk in 1984, and they decided to travel to Rowan County to look for Aledith's child. The newspaper article of 18 July 1984 related the details of their unsuccessful search and then stated:

> If anyone, they say, knows anything about a little blonde baby left here when the county fair closed and the carnies moved on in September 1967, Lee and Aledith Gottschalk can be reached in Room 173 at the Econo Motel.

Shortly after the article was published, the Gottschalks were called at the motel and informed of the child's identity and whereabouts.

The defendants published a second article on 20 July 1984 reporting that the Gottschalks had located the child with the aid of responses to the earlier article. The second article identified the child as Susie Hall and identified her adoptive mother as Mary Hall. The article related the details of a telephone encounter between the Gottschalks and Mrs. Hall and described the emotions of both families.

The plaintiffs alleged that they fled their home in order to avoid public attention resulting from the articles. Each plaintiff

alleged that she sought and received psychiatric care for the emotional and mental distress caused by the incident.

The defendants have contended at all times that the imposition of civil liability for their truthful public disclosure of facts about the plaintiffs would violate the First Amendment to the Constitution of the United States. The defendants have contended in the alternative that this Court should refuse to adopt any tort which imposes liability for such conduct as a part of the common law of this State.

Although the plaintiffs contended before the Court of Appeals that their claims constituted valid claims both for public disclosure of embarrassing private facts and for intrusion upon the plaintiffs' seclusion or solitude or into their private affairs, we agree with the Court of Appeals that the intrusion branch of the invasion of privacy tort is not involved here. *Hall v. Post*, 85 N.C. App. at 615, 355 S.E. 2d at 823-24. Therefore, we strictly limit our consideration in the present case to issues concerning the private facts branch of the invasion of privacy tort. We neither consider nor decide whether any other tort is constitutional or cognizable at law upon facts such as those presented here.

It is well known that the concept of a right of privacy recognizable in law appears to have originated in a law review article by Louis D. Brandeis, later a Justice of the Supreme Court of the United States, and his law partner, Samuel D. Warren. Warren & Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890). The fact that Brandeis, then only thirty-three years of age, failed to foresee the constitutional problems arising from the views set forth in the article is not very remarkable, since no court in 1890 had held that the First Amendment would be applied to the states through the Fourteenth Amendment. *Cf. Barron v. City of Baltimore*, 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833) (holding that the Bill of Rights did not apply to the states). Indeed, the Supreme Court of the United States did not begin to recognize First Amendment incorporation until the end of the first quarter of the twentieth century. *See, e.g., Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 75 L.Ed. 1357 (1931); *Fiske v. Kansas*, 274 U.S. 380, 71 L.Ed. 1108 (1927); *Gitlow v. New York*, 268 U.S. 652, 69 L.Ed. 1138 (1925).

In 1916—twenty-six years after the article on privacy was published—Brandeis became a Justice of the Supreme Court. In a landmark concurring opinion which established his reputation as a constitutional scholar, he fully accepted the doctrine of First Amendment incorporation. *Whitney v. California*, 274 U.S. 357, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring).

Since the publication of the nineteenth century Warren and Brandeis article in the Harvard Law Review, two different broad categories of privacy rights have evolved. *See generally* Annotation, *Supreme Court's Views As To The Federal Legal Aspects Of The Right Of Privacy*, 43 L.Ed. 2d 871, 875-76 (1975). One is the *constitutional* right of privacy which protects personal privacy from certain types of *governmental* intrusion. *See, e.g., Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 53 L.Ed. 2d 867 (1977); *Roe v. Wade*, 410 U.S. 113, 35 L.Ed. 2d 147 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 14 L.Ed. 2d 510 (1965). The other is the general right of privacy, violations of which have been viewed by some as giving rise to a tort composed of four branches, only one of which is of concern in the present case. This Court has recently acknowledged that, as to this general right to privacy:

> A review of the current tort law of all American jurisdictions reveals cases identifying at least four types of invasion of four different interests in privacy: (1) appropriation, for the defendant's advantage, of the plaintiff's name or likeness; (2) intrusion upon the plaintiff's seclusion or solitude or into his *private affairs*; (3) public disclosure of *private* facts about the plaintiff; and (4) publicity which places the plaintiff in a false light in the public eye. *See* W. Prosser, *Handbook of the Law of Torts* § 117 (4th ed. 1971) (emphasis added).

*Renwick v. News and Observer*, 310 N.C. 312, 322, 312 S.E. 2d 405, 411, *cert. denied*, 469 U.S. 858, 83 L.Ed. 2d 121 (1984).

In the present case, we consider for the first time that branch of the invasion of privacy tort which is most commonly referred to as the "public disclosure of private facts." The plaintiffs have at all times acknowledged that the facts published about them by the defendants were true and accurate in every respect, but they contend, nevertheless, that they are entitled to recover.

Under the definition of the private facts tort set out in the Restatement (Second) of Torts, liability will be imposed for publi-

cation of "private facts" when "the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Restatement (Second) of Torts § 652D (1977). That definition includes four elements: (1) publicity; (2) private facts; (3) offensiveness; and (4) absence of legitimate public concern. *Id.*, commentary. With regard to what has become known as the "newsworthiness" or "public interest," i.e., "legitimate public concern" standard, the Restatement view is that:

> In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the *community mores*. The line is to be drawn when the publicity ceases to be the giving of information *to which the public is entitled,* and becomes a morbid and sensational prying into private lives for its own sake, with which a *reasonable member* of the public, with *decent* standards, would say that he has no concern.

*Id.*, Comment h (emphasis added).

Since the American Revolution and our independence, the common law has continued to apply in North Carolina. N.C.G.S. § 4-1 (1986). Unless modified or repealed by the General Assembly or this Court, the "common law" to be applied is the common law of England as it existed when North Carolina became a sovereign State in 1776. *Bruton, Attorney General v. Enterprises, Inc.,* 273 N.C. 399, 417, 160 S.E. 2d 482, 494 (1968). *See* N.C.G.S. § 4-1 (1986).

The private facts branch of the invasion of privacy tort was not recognized at common law in 1776 or at the times of adoption of either the Constitution or the Bill of Rights. It has never been recognized in England, Australia, New Zealand, Canada, or other jurisdictions sharing the heritage of the English common law. Davis, *What Do We Mean By "Right To Privacy"?,* 4 S.D.L. Rev. 1, 4 (1959). After an extensive study, the British Committee on Privacy recommended that the invasion of privacy tort not be adopted in Great Britain, because its application would be too difficult and time consuming and would unnecessarily threaten free speech. *See generally* Report of the Committee on Privacy, Cmd. 5, No. 5012 at 206 (1972), *cited with approval in* Zimmerman, *Req-*

*uiem for a Heavyweight: A Farewell to Warren and Brandeis's Privacy Tort,* 68 Cornell L. Rev. 291, 335 n.237 (1983) [hereinafter *Requiem for a Heavyweight*].

Although expressing constitutional and other reservations, this Court has recognized a general right of privacy as a part of the tort law of this State. *See Flake v. News Co.,* 212 N.C. 780, 195 S.E. 55 (1938) (recognizing the "appropriation" branch of the tort). However, we have not recognized or applied either of the two branches of the tort which, because they arise from publicity, most directly affect First Amendment speech and press rights. Quite to the contrary, we have refused to recognize the branch of the invasion of privacy tort arising from publicity by which the defendant places the plaintiff in a *false* light in the public eye. *Renwick v. News and Observer,* 310 N.C. 312, 312 S.E. 2d 405. We did so because "false light" claims often would duplicate or overlap existing claims for relief. *Id.* at 323, 312 S.E. 2d at 412. Additionally, "recognition of a separate [false light] tort . . . would tend to add to the tension already existing between the First Amendment and the law of torts . . . ." *Id.* For the same reasons, we now hold that claims for invasions of privacy by publication of *true* but "private" facts are not cognizable at law in this State.

The Supreme Court of the United States has specifically declined to "address the broader question whether *truthful* publications *may ever* be subjected to civil or criminal liability consistently with the First and Fourteenth Amendments." *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491, 43 L.Ed. 2d 328, 347 (1975) (emphasis added). *But see Smith v. Daily Mail Publishing Co.,* 443 U.S. 97, 61 L.Ed. 2d 399 (1979) (statute prohibiting publication of defendant-juvenile's name unconstitutional, because state's interest in protecting juveniles and ensuring their rehabilitation could not overcome defendants' rights of speech and press); *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 56 L.Ed. 2d 1 (1978) (same result and reasoning where statute prohibited publishing information regarding confidential proceedings before state judicial review commission). We do not find it necessary to answer that "broader question" here. It is enough for us to decide here, as we did in *Renwick,* that adoption of the tort sought by the plaintiffs would add to the existing tensions between the First Amendment and the law of torts and would be of little practical value to anyone.

---

Hall v. Post

---

This action between two non-governmental parties does not involve "a situation in which two constitutional interests must be balanced in apposition, but rather one in which state [tort] laws protecting privacy are constrained by the federal Constitution. The 'privacy' interest involved is not a constitutionally protected privacy . . . ." Rich & Brilliant, *Defamation-In-Fiction: The Limited Viability Of Alternative Causes Of Action*, 52 Brooklyn L. Rev. 1, 20 n.94 (1986) [hereinafter *Alternative Causes of Action*]. As the constitutional right of privacy is not involved here, a reasonable argument certainly can be made that the First Amendment rights of speech and press control and prohibit recovery in these actions against the defendants for publishing the truth.

Further, the Supreme Court of the United States has consistently held that even *false* statements *which cause actual harm* must be given limited "breathing space." *See Requiem for a Heavyweight*, 68 Cornell L. Rev. at 313 n.105 (citations to eighteen such cases). To do otherwise would unduly limit the rights of free speech and press by causing writers and speakers to cautiously exercise those rights for fear of liability. *Hustler Magazine v. Falwell*, 485 U.S. ---, 99 L.Ed. 2d 41 (1988). This in turn would reduce the vigor and limits of public debate. *Id.* Surely, it would be reasonable to argue that the publication of *true* statements, such as those made by the defendants, are entitled to no less constitutional protection than that guaranteed *false* statements.

In several cases the Supreme Court has extended certain defenses required by the First Amendment in defamation cases to other types of tort actions, when the plaintiff's claim arose as a result of the defendants' writings or speech. *E.g., Hustler Magazine v. Falwell*, 485 U.S. ---, 99 L.Ed. 2d 41 (intentional infliction of emotional distress); *Time, Inc. v. Hill*, 385 U.S. 374, 17 L.Ed. 2d 456 (1967) (false light invasion of privacy). Such decisions may be fairly read as at least implying that the same constitutional protection given true statements in defamation actions must also be given to true statements in all other tort actions, *when the plaintiff's claim arises from the defendant's writings or speech. See Meeropol v. Nizer*, 560 F. 2d 1061, 1066 (2d Cir. 1977), *cert. denied*, 434 U.S. 1013, 54 L.Ed. 2d 756 (1978) ("The same standards of constitutional protection apply to an invasion of privacy and to libel actions."). Indeed, as we pointed out in *Renwick*, at

least one respected scholar seems to have adopted this same view.

> In 1964, the Supreme Court of the United States decided *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) which held that the First Amendment itself imposes limitations upon state claims for libel or slander. In 1967, the Supreme Court decided *Time, Inc. v. Hill*, 385 U.S. 375 (1967) which extended First Amendment protections *at least* as stringent as those required by *Sullivan* to defendants in cases for false light invasion of privacy. *See* Restatement (Second) of Torts § 652E comment d (1977). "By this decision, and others which followed it, the two branches of invasion of privacy which turn on publicity [public disclosure of embarrassing private facts and false light invasions of privacy] were taken over under the Constitutional Privilege. The other two, however, are pretty clearly not." W. Prosser, *Handbook of the Law of Torts*, § 118 at 827 (4th Ed. 1971).

*Renwick v. News and Observer*, 310 N.C. at 324-25, 312 S.E. 2d at 412-13.

> "[A] cause of action predicated on public disclosure of private facts depends for its success on the truthfulness of the published material." *Alternative Causes of Action*, 52 Brooklyn L. Rev. at 16-17. The Supreme Court of the United States has specifically recognized that "it is here that claims of privacy *most directly confront* the constitutional freedoms of speech and press." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. at 489, 43 L.Ed. 2d at 346 (emphasis added). Thus, it is obvious here, just as it was obvious in *Renwick*, that the branch of the invasion of privacy tort which the plaintiffs seek to have us adopt is constitutionally suspect and, even if it ultimately manages to survive constitutional review, "would tend to add to the tension already existing between the First Amendment and the law of torts . . . ." *Renwick v. News and Observer*, 310 N.C. at 323, 312 S.E. 2d at 412.

> Additionally, just as was the case in *Renwick*, the branch of the tort we are asked to adopt here would "duplicate or overlap" other torts. *Renwick v. News and Observer*, 310 N.C. at 323, 312 S.E. 2d at 412. For example, the private facts tort as defined in the Restatement will, as a practical matter, tend to duplicate or overlap the tort of intentional infliction of emotional distress.

In North Carolina, the tort of intentional infliction of emotional distress,

> consists of (1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another. The tort may also exist where defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress. Recovery may be had for the emotional distress so caused and for any other bodily harm which proximately results from the distress itself.

*Dickens v. Puryear*, 302 N.C. 437 at 452-53, 276 S.E. 2d 325 at 335 (1981). Although theoretically possible, it is unlikely that a juror would find that a defendant had committed the private facts tort but fail to find that the defendant had intentionally inflicted emotional distress. For example, to find that the defendant publicized a matter "not of legitimate concern to the public" under the definition of the private facts tort, a juror first must find that the defendant publicized it as part of "a morbid and sensational prying into [the plaintiff's private life] . . . for its own sake, with which a reasonable member of the public with decent standards, would say he has no concern." *See* Restatement (Second) of Torts § 652D Comment h (1977).

Further, to find the private facts tort, the juror must find that the material published would be "highly offensive to a reasonable person." *Id.* It seems almost inevitable that a juror having made those findings concerning the private facts tort would also find that the defendant's conduct was "extreme and outrageous" and that the defendant was recklessly indifferent to the likelihood that he would cause severe emotional distress. Therefore, if a reasonable juror believed that the defendant had committed the private facts tort, it seems clear as a practical matter that the juror would also believe that the same conduct amounted to intentional infliction of emotional distress.

Further, a plaintiff seeking to recover under the private facts tort as defined in the Restatement must *always establish* three specific *additional* elements which are not necessary elements of the tort of intentional infliction of emotional distress: (1) publication (2) of private facts (3) which are not "newsworthy," i.e., not of "legitimate concern to the public" or of "public interest." *Id.*

Therefore, in almost every instance in which a North Carolina plaintiff could establish a claim under the private facts tort, the same plaintiff could more easily establish a claim for intentional infliction of emotional distress. Since plaintiffs will only be entitled to recover once, if at all, it would seem that recognition of the private facts tort by this Court would deliver nothing of any real value.

The same two basic concerns which prevented our adoption of the tort of false light invasion of privacy strongly favor our rejecting the tort of invasion of privacy by publishing private facts, as to which not even truth is a defense. First, decisions of the Supreme Court of the United States, scholarly articles and the Restatement make it clear that the private facts branch of the invasion of privacy tort is, at the very best, constitutionally suspect. *E.g., Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 43 L.Ed. 2d 328; Restatement (Second) of Torts § 652D special note (1977); M. Franklin, *The Origins and Constitutionality of Limitations on Truth as a Defense in Tort Law*, 16 Stan. L. Rev. 789 (1963-64); *Alternative Causes of Action*, 52 Brooklyn L. Rev. 1; *Requiem for a Heavyweight*, 68 Cornell L. Rev. 291; Kalden, *Privacy in Tort Law— Were Warren and Brandeis Wrong?*, 31 L. & Contemp. Probs. 326 (1966). Therefore, it would be entirely unrealistic to suggest that adoption of the private facts tort would do other than "add to the tension already existing between the First Amendment and the law of torts." *Renwick v. News and Observer*, 310 N.C. at 323, 312 S.E. 2d at 412. Second, the constitutionally suspect private facts branch of the invasion of privacy tort will almost never provide a plaintiff with any advantage not duplicated or overlapped by the tort of intentional infliction of emotional distress and possibly by other torts such as trespass or intrusive invasion of privacy. We reemphasize here, however, that in this case we do not consider or decide the "broader question" of whether any other tort is constitutional or cognizable at law upon facts such as those presented here. *See generally Cox Broadcasting Corp. v. Cohn*, 420 U.S. at 491, 43 L.Ed. 2d at 347.

We conclude that any possible benefits which might accrue to plaintiffs are entirely insufficient to justify adoption of the constitutionally suspect private facts invasion of privacy tort which punishes defendants for the typically American act of broadly

proclaiming the truth by speech or writing. Accordingly, we reject the notion of a claim for relief for invasion of privacy by public disclosure of true but "private" facts.

For the foregoing reasons, the decision of the Court of Appeals is reversed.

Reversed.

Justice FRYE concurring in result.

The majority holds that summary judgment was appropriately entered for the defendants in these cases in which the plaintiffs sought recovery for tortious invasion of privacy by public disclosure of private but true facts concerning the plaintiffs. I agree that plaintiffs have failed to forecast evidence sufficient to withstand defendants' motions for summary judgment and that summary judgment was appropriately entered against the plaintiffs. I therefore concur in the result reached by the majority.

I do not concur in the reasoning of the majority which leads it to "reject the notion of a claim for relief for invasion of privacy by public disclosure of true but 'private' facts." I do not accept the notion that the tension already existing between the first amendment and the law of torts requires the nonrecognition of a legitimate claim by a nonpublic figure against a media defendant for wrongfully publishing highly offensive private facts which are not of legitimate concern to the public. While public figures give up some of their rights to privacy in the public interest, I do not believe that the media should be given a license to pry into the private lives of ordinary citizens and spread before the public highly offensive but very private facts without any degree of accountability. Such is not required by either the federal or state constitutions.

In this case the trial court entered summary judgment in favor of defendants against both plaintiffs. The Court of Appeals held that summary judgment was improperly granted, and in so holding explicitly found that the publication of private but true facts may give rise to a cause of action for an invasion of the right to privacy. While I agree with the Court of Appeals that this tort is recognizable in this jurisdiction, I would reverse its

decision on the grounds that the published information in this case was of legitimate concern to the public.

On appeal, defendants contend they were entitled to summary judgment because publication of private but true facts is not a recognizable invasion of privacy tort in this State. In the alternative, if this Court recognizes the tort, defendants contend that they were still entitled to summary judgment because the matter they published concerning plaintiffs was neither private nor highly offensive and was of legitimate concern to the public.

Although jurisdictions were slow to recognize invasion of privacy causes, today the tort has been adopted, in one form or another, in virtually all jurisdictions. W. Keeton, *Prosser and Keeton on The Law of Torts* § 117 (5th ed. 1984).

North Carolina first recognized the invasion of privacy tort as a separate cause of action when this Court held that a plaintiff stated a cause of action for invasion of privacy when a defendant newspaper used without authorization a photograph of the plaintiff in an advertisement. *Flake v. News Co.*, 212 N.C. 780, 195 S.E. 55 (1938) (recognizing the "appropriation" form of invasion of privacy). Recently, however, this Court refused to recognize the "false light" invasion of privacy tort. *Renwick v. News and Observer and Renwick v. Greensboro News*, 310 N.C. 312, 312 S.E. 2d 405, *cert. denied,* 469 U.S. 858, 83 L.Ed. 2d 121 (1984). The reasoning behind this Court's decision in *Renwick* was a concern that "any right to recover for a false light invasion of privacy will often either duplicate an existing right of recovery for libel or slander or involve a good deal of overlapping with such rights." *Id.* at 323, 312 S.E. 2d at 412. Further, this Court was concerned that "the recognition of a separate tort . . . to the extent it would allow recovery beyond that permitted in actions for libel or slander, would tend to add to the tension already existing between the First Amendment and the law of torts in cases of this nature." *Id.*

Heretofore, we have not been called upon to determine whether North Carolina would recognize a cause of action for the remaining two torts — unreasonable intrusion and unreasonable

publicity of private facts.[1] Although plaintiffs, in their appeal to the Court of Appeals, contended that their claims constituted both an intrusion into their private affairs and an unreasonable disclosure of private facts, I agree with the majority and with the Court of Appeals that the unreasonable intrusion tort is not involved here. *See Hall v. Post,* 85 N.C. App. at 615, 355 S.E. 2d at 823-24. Therefore, I express no opinion as to whether the intrusion tort is cognizable in this jurisdiction.

According to the Restatement, liability is imposed for the unreasonable publication of private facts when "the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Restatement (Second) of Torts § 652D (1977). In the commentary to § 652D, the tort is divided into four distinct elements: (1) publicity; (2) private facts; (3) offensiveness; and (4) lack of legitimate public concern.

The publicity given to a private fact means that the fact is communicated "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D (1977). Thus, publication by the media would satisfy the publicity requirement. *Virgil v. Time, Inc.,* 527 F. 2d 1122, 1126 (9th Cir. 1975), *cert. denied,* 425 U.S. 998, 48 L.Ed. 2d 823 (1976).

Next, the matter disclosed must be private. There is no liability for publishing a fact that is already in the public domain, such as publishing facts that are in the public record. *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 43 L.Ed. 2d 328 (1975). However, merely revealing private facts to family members and close friends does not mean that the fact has become public:

> Every individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, but keeps entirely to himself or at most reveals only to his family or to close personal friends. Sexual rela-

---

1. Although this Court has not had occasion to determine the viability of the "private facts" tort, the Court of Appeals, prior to this case, had on two occasions denied recovery, without expressly deciding whether such cause of action exists. *See Trought v. Richardson,* 78 N.C. App. 758, 338 S.E. 2d 617, *disc. rev. denied,* 316 N.C. 557, 344 S.E. 2d 18 (1986); *Morrow v. Kings Department Stores, Inc.,* 57 N.C. App. 13, 290 S.E. 2d 732, *disc. rev. denied,* 306 N.C. 385, 294 S.E. 2d 210 (1982).

tions, for example, are normally entirely private matters, as are family quarrels, many unpleasant or disgraceful or humiliating illnesses, most intimate personal letters, most details of a man's life in his home, and some of his past history that he would rather forget.

Restatement (Second) of Torts § 652D comment b (1977).

Third, the fact published must be highly offensive to a reasonable person. "Complete privacy does not exist in this world except in a desert, and anyone who is not a hermit must expect and endure the ordinary incidents of the community life of which he is a part." *Id.* comment c.

Finally, even when the fact published is highly offensive to the ordinary person, if the matter is of legitimate concern to the public, the publisher of the fact will incur no liability. *See Bereskey v. Teschner*, 64 Ill. App. 3d 848, 381 N.E. 2d 979 (1978) (fact that man died of drug overdose held newsworthy, as a matter of law).

Since the inception of the private facts tort, courts have struggled with the tension between the freedom of the press, secured by the first amendment, to disseminate information to the public and an individual's right to be left alone. *See, e.g., Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 43 L.Ed. 2d 328; *Gilbert v. Medical Economics Co.*, 665 F. 2d 305 (10th Cir. 1981); *Virgil v. Time, Inc.*, 527 F. 2d 1122; *Briscoe v. Reader's Digest Association*, 93 Cal. Rptr. 866, 483 P. 2d 34 (1971); *Deaton v. Delta Democrat Publishing Co.*, 326 So. 2d 471 (Miss. 1971).

The first amendment encourages robust debate and the gravamen of the first amendment, as recently stated by the Supreme Court, is the "recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler Magazine v. Falwell*, 485 U.S. ---, 99 L.Ed. 2d 41, 49 (1988). Furthermore, "the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and vitality of society as a whole." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 503-04, 80 L.Ed. 2d 502, 518 (1984).

Alternatively, the right to be free from unwarranted publicity is premised on the right to keep private facts private. *Rawlins v. Hutchinson Publishing Co.*, 218 Kan. 295, 543 P. 2d 988 (1975). The private facts tort protects one's "ability to make and implement autonomously decisions regarding access to personal and private information." Swan, *Publicity Invasion of Privacy: Constitutional and Doctrinal Difficulties With a Developing Tort*, 58 Ore. L. Rev. 483, 488 (1980).

However, neither the constitutional right of freedom of the press nor the right to be free from publicity is absolute. For example, in defamation cases, the Supreme Court has held that "there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz v. Welch*, 418 U.S. 323, 340, 41 L.Ed. 2d 789, 805 (1974) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L.Ed. 2d 686 (1964) ). Conversely, it has been held that when a private fact is also of legitimate concern to the public, the right to be free from unwarranted publicity must yield to the right of the public to know. *See Beresky v. Teschner*, 64 Ill. App. 3d 848, 381 N.E. 2d 979.

The Supreme Court has specifically left unanswered the "question whether truthful publication of very private matters unrelated to public affairs could be constitutionally proscribed." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491, 43 L.Ed. 2d 328, 347. However, I agree with our Court of Appeals' conclusion that the resolution of the conflicting rights lies in the "application of a 'newsworthiness' or 'public interest' standard in determining what publications are constitutionally privileged and what publications are actionable." *Hall v. Post*, 85 N.C. App. at 616, 355 S.E. 2d at 824. Adopting this standard gives credence to the viewpoint that neither the right to privacy nor the right of freedom of the press is absolute.

At the outset, I recognize the concern voiced by many courts and commentators concerning the possible chilling effect that the recognition of this tort may have on the freedom of the press to publish matters of legitimate public concern. *See, e.g., Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 43 L.Ed. 2d 328; *Gilbert v. Medical Economics Co.*, 665 F. 2d 305; *Virgil v. Time, Inc.*, 527

F. 2d 1122; *Anderson v. Fisher Broadcasting Co. Inc.*, 300 Ore. 452, 712 P. 2d 803 (1986); Zimmerman, *Requiem For A Heavyweight: A Farewell to Warren and Brandeis' Privacy Tort*, 68 Cornell L. Rev. 291 (1983); Swan, *Publicity Invasion of Privacy: Constitutional and Doctrinal Difficulties With A Developing Tort*, 48 Ore. L. Rev. 483 (1980). The freedom to publish matters of legitimate public concern is guaranteed by both the federal and state constitutions. *See* U.S. Const. amend. I; N.C. Const. art. I, § 14 (freedom of the press shall never be restrained). However, the chilling effect is minimized if the question of whether the published material is of legitimate concern to the public is initially a question of law for the trial court. This eliminates the fear voiced by the *amici* in their brief filed with this Court that if the question of public concern was one for the jury it would subject every print and broadcast journalist to an *ex post facto* jury of lay censors and would convert every news story about a private citizen into a potential jury issue. Therefore, if the court determines that every reasonable person applying the proper standard would have to conclude that the published matter was of legitimate concern to the public, then the publication would be privileged and the granting of summary judgment would be proper. *See Virgil v. Sports Illustrated*, 424 F. Supp. 1286, 1289 (S.D. Cal. 1976).

In determining whether published information is of legitimate concern to the public, I would adopt the standard set out in the Restatement (Second) of Torts:

> [t]he line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern.

Restatement (Second) of Torts, § 652D comment h. *See also Virgil v. Time, Inc.*, 527 F. 2d 1122.

Thus, if the court determines that there is "no possibility that a juror could conclude that the personal facts were included for any inherent morbid, sensational, or curiosity appeal they might have," *Virgil v. Sports Illustrated*, 424 F. Supp. 1286, 1289, then as a matter of law there would be no cause of action.

In short, I would adopt the private facts tort consisting of the elements as stated in the Restatement (Second) of Torts. I now consider these elements.

### 1. Publicity

The publicity element of this tort was not applied by the Court of Appeals to the facts of this case, apparently because once a matter is published in a newspaper, the publicity element is presumed satisfied. *See Virgil v. Time, Inc.*, 527 F. 2d 1122, 1126.

### 2. Offensiveness

The Court of Appeals stated that it is a jury determination as to whether a challenged publication would be highly offensive to a reasonable person, because, as in negligence cases, a reasonable person standard generally requires a jury determination. *Hall v. Post*, 85 N.C. App. at 623, 355 S.E. 2d at 828. I agree with the Court of Appeals that generally it is a jury determination as to the offensiveness of the publication. Moreover, I agree that summary judgment was improper on this issue because, in applying this standard to the facts of this case, "a jury could properly find that an ordinary reasonable person (adoptive mother or child) would find it highly offensive and distressing to have spread before the public gaze their identities, the fact that the child had been abandoned by carnival workers, or the sensational emotional details of their encounter with the natural mother." *Id.*

### 3. Private Facts

In addressing the question whether the published matter was still private, the Court of Appeals stated the correct standard: (a) No liability attaches when a defendant merely gives further publicity to a fact that is already in the public domain, and (b) A fact may still be private even though an individual has confided the information to family members or close personal friends. *Hall v. Post*, 85 N.C. App. at 621, 355 S.E. 2d at 827.

Defendants contend here, as they did in the Court of Appeals, that they presented evidence that the plaintiffs' story was not private prior to the publications at issue and that plaintiffs failed to come forward with proof sufficient to create a genuine issue of material fact.

In applying the above standard to the facts of this case, the Court of Appeals held that, based on the affidavits, pleadings, and other materials before the court, the trial judge erred in granting defendants' motion for summary judgment. I agree with the Court of Appeals that, "taken in the light most favorable to plaintiffs, these materials raise an issue of fact regarding whether some or all of the facts published about the plaintiffs were publicly known or were, in fact, private prior to publication of the two articles complained of by the plaintiffs." *Hall v. Post*, 85 N.C. App. at 623, 355 S.E. 2d at 828. Thus, defendants are not entitled to summary judgment on the ground that the facts were public, rather than private.

### 4. **Public Concern**

The Court of Appeals adopted the public interest, i.e., legitimate concern to the public, standard as set out in the Restatement:

> In determining what is a matter of public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores. The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards would say that he has no concern.

Restatement (Second) of Torts § 652D comment h (1977).

While I generally agree with this standard, it must be considered in context with the guarantees granted to the press by the first amendment.

I agree with defendants that the legitimate concerns to the public must be defined in the most liberal and far-reaching terms in order to avoid any chilling effect on the constitutional right of the media to publish information of public interest. I am not unmindful of the wide privilege granted the media for enlightening the public:

> The guarantees for speech and press are not the preserve of political expression or comment upon public affairs, essential

as those are to healthy government. One need only pick up any newspaper or magazine to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials. Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period."

*Time, Inc. v. Hill*, 385 U.S. 374, 388, 17 L.Ed. 2d 456, 467 (1967) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 102, 84 L.Ed. 1093, 1102 (1940) ).

I now turn to the application of the legitimate public concern standard to the facts of the case *sub judice*. I do not agree with the Court of Appeals' conclusion that a reasonable juror could conclude that the articles at issue here constituted a "morbid and sensational prying into private lives for its own sake." On the contrary, the article was initiated when the biological mother, Aledith Gottschalk, returned to Salisbury in search of her daughter, whom she had abandoned seventeen years earlier. This was unquestionably a story of matters of public interest and concern. The central focus was on a mother's search for her abandoned daughter, and the events and emotions relating thereto. When defendants reported that Mrs. Gottschalk thought that her daughter might have been left with a Mary Hall, and subsequently that she had located her daughter, defendants were simply reporting the details of a news story that had arisen as a result of Mrs. Gottschalk's return. However much plaintiffs may have wished to keep their personal histories out of public view, they became a legitimate public concern upon Mrs. Gottschalk's return. "There are times when one, whether willingly or not, becomes an actor in an occurrence of public or general interest." *Meetze v. Associated Press*, 230 S.C. 330, 337, 95 S.E. 2d 606, 609 (1956).

I conclude that, taking the Post articles as a whole, no reasonable juror could conclude that the articles constituted a morbid and sensational prying into plaintiffs' private lives for its own

sake. Therefore, I would hold, as a matter of law, that the published information was of legitimate concern to the public. Thus, the trial court correctly entered summary judgment for defendants on the ground that the facts were of legitimate concern to the public.

In summary, I would hold that the private facts tort is cognizable in this jurisdiction but that plaintiffs' forecast of evidence was insufficient to withstand defendants' summary judgment motion. Thus, I concur in the result reached by the majority in this case while disagreeing with the reasons given therefor.

Justice MEYER joins in this concurring opinion.