IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-905

Filed 3 September 2025

Pender County, No. 21CVS000112-700

PAUL A. NICHOLS and spouse
KATHLEEN M. NICHOLS, Plaintiffs,

v.

CAMERON C. CALHOUN and spouse
PAMELA M. CALHOUN, Defendants.

v.

AVILA HOMEOWNERS ASSOCIATION,
INC., Additional Defendant.

Appeal by Plaintiffs from judgment entered 8 May 2024 by Judge George F.

Jones in Pender County Superior Court. Heard in the Court of Appeals 20 May 2025.

*Ennis, Baynard, Morton, Medlin & Brown, PLLC, by B. Danforth Morton and Maynard M. Brown, for Plaintiffs-Appellants.*

*Equitas Law Partners, LLP, by Thomas S. Babel and Lieth O. Khatib, for Defendants-Appellees.*

CARPENTER, Judge.

Paul A. Nichols ("Plaintiff-Paul") and Kathleen M. Nichols ("Plaintiff-Kathleen") (collectively, "Plaintiffs") appeal from judgment entered after a jury found them liable to Cameron C. Calhoun ("Defendant-Cameron") and Pamela M. Calhoun ("Defendant-Pamela") (collectively, "Defendants") for invasion of privacy. On appeal, Plaintiffs argue the trial court erred by denying their motions for directed verdict and judgment notwithstanding the verdict ("JNOV") on Defendants' counterclaim for

invasion of privacy.  After careful review, we affirm.

## I.  Factual & Procedural Background

This case arises from a conflict between neighbors.  At the time of these events, Plaintiffs and Defendants lived next-door to one another in Avila, a subdivision in Pender County, North Carolina.  Defendants moved into Avila in 2015 and Plaintiffs moved in at the end of 2017.  Defendants' home was located on Lot 2 off Avila Avenue—one of two lots in Avila situated along the Intracoastal Waterway (the "Waterway").  Plaintiffs' home was located on Lot 4 off Avila Avenue—the lot next to Defendants.  Plaintiffs' enclosed side porch faced east towards Defendants' home and the Waterway, while the front porch of Defendants' home faced west in the direction of Plaintiffs' side porch.  Defendants considered the area between their front door and the boundary line between the parties' lots to be their backyard—a space that Plaintiff-Kathleen once referred to as a "fishbowl."

After Plaintiffs moved into the neighborhood, the parties became friends.  They ate dinners together, went boating together, and Defendants' children would often play at Plaintiffs' house.  In 2019, Defendants installed a four-foot-tall picket metal fence (the "Old Fence") along the boundary line between the parties' lots.  Plaintiffs did not object to the installation of the Old Fence because it did not obstruct their view of the Waterway.

Beginning in May 2020, the parties experienced a falling out.  Problems first arose when Plaintiff-Kathleen became upset with Defendant-Pamela for sharing,

with two other Avila residents, a before-and-after video of Plaintiffs' basement, which Defendant-Pamela recorded with her phone. Plaintiff-Kathleen had previously hired Defendant-Pamela to organize Plaintiffs' basement and Defendant-Pamela shared the video, in her view, to attract prospective clients. According to Plaintiffs, however, the video included footage of a section of Plaintiffs' basement that Defendant-Pamela was not hired to organize; a section Plaintiffs colloquially referred to as their "store." Plaintiffs' "store" included a stockpile of canned goods, toilet paper, paper towels, and other groceries. Plaintiffs were concerned, due to the COVID-19 pandemic, that people would see the video and break into their home to steal items from their "store."

Defendant-Pamela assured Plaintiff-Kathleen that she had not shown the video to anyone other than the two Avila residents and apologized to Plaintiff-Kathleen "over and over." Defendant-Pamela also told Plaintiff-Kathleen that she did not send the video to anyone and provided Plaintiff-Kathleen with verification that Defendant-Pamela had not texted, emailed, or otherwise sent the video to the two Avila residents. Despite these efforts, Plaintiff-Kathleen seemed unconvinced that Defendant-Pamela did not send the video to anyone, so Defendant-Cameron provided Plaintiffs with a copy of Defendants' phone records. Nevertheless, Plaintiffs remained unsatisfied and asked Defendant-Cameron to provide Plaintiffs with Defendants' Apple ID's because the phone records Defendants provided, according to Plaintiffs, did not "show iPhone to iPhone transmissions." Defendant-Cameron refused.

Following the conflict concerning the video, Defendants became upset with Plaintiffs when they observed their young daughter playing a board game with Plaintiffs under the Old Fence. Plaintiffs were under the impression that Defendants gave their daughter permission to come out and play. Defendants, however, maintained they did not, and believed their daughter was missing. When Defendant-Cameron located his daughter, he approached the Old Fence, instructed his daughter to go inside their home, and confronted Plaintiffs. The conversation became heated, ending when Plaintiff-Paul "corral[led]" Plaintiff-Kathleen to escort her back inside Plaintiffs' home. Thereafter, Plaintiff-Paul sent an email to Defendant-Cameron stating Plaintiffs were "willing to endure litigation to get [to the] truth" about the basement video.

Throughout the summer of 2020, the parties' relationship continued to deteriorate. At one point, Plaintiff-Kathleen texted Defendant-Pamela, stating that her husband, Defendant-Cameron, was a "douchebag." Additionally, Plaintiff-Paul and Defendant-Cameron exchanged several messages in which Plaintiff-Paul complained about Defendants' chickens and asked Defendants to contain the chickens to Defendants' backyard. According to Defendant-Cameron, Plaintiffs never complained about Defendants' chickens prior to the parties' falling out.

Tensions culminated when, on 1 September 2020, Defendants replaced the Old Fence with a six-foot-tall wood privacy fence (the "New Fence"). While the New Fence was being installed, Plaintiff-Paul contacted the president of the home owners

association ("HOA") because he believed the New Fence violated the HOA covenants. Plaintiff-Paul also called Defendant-Cameron to ask him to stop installing the New Fence, but Defendant-Cameron declined. Plaintiffs' primary concern was that the New Fence obstructed their view of the Waterway.

On 1 February 2021, Plaintiffs filed a complaint against Defendants in Pender County Superior Court, alleging the New Fence was a "spite fence" and requesting an injunction compelling Defendants to remove the New Fence. On 5 April 2021, Defendants filed an answer and counterclaim, claiming Plaintiffs were also in violation of the HOA covenants for erecting a greenhouse. Thereafter, Defendants filed a proposal with Avila's Architectural Control Committee ("ACC") seeking approval of the already-installed New Fence. On 10 July 2021, the ACC approved the New Fence with the stipulation that it be painted. Plaintiffs, along with a few other Avila residents, appealed the ACC's decision. While the fence appeal was pending, Defendant-Cameron arranged to have the New Fence painted. On 18 October 2021, the HOA notified Plaintiffs that the New Fence would be painted on 19 October 2021, and that the painters would need to access Plaintiffs' lot. Plaintiff-Paul responded to the HOA notice, stating he did not want the New Fence to be painted or for the painters to enter Plaintiffs' lot.

Shortly after this exchange, Plaintiffs installed a security camera inside their side porch. The camera was located atop a sliding glass door, above the New Fence line, facing due east towards Defendants' home.





Although Defendants' backyard was within the camera's field of view, Plaintiffs claimed they only installed the camera to monitor activity on their side of the New Fence. According to Plaintiffs, the camera "had the ability to record," but Plaintiffs did not record any footage because they did not know "how to put the SD card in." Nonetheless, due to the camera being activated by motion and connected to Wi-Fi, Plaintiffs were able to view, through their phones, livestream footage of any movement captured by the camera. Plaintiffs maintained, however, that they never used the camera to "spy" on Defendants.

Defendant-Cameron first noticed a "ring of red lights" coming from Plaintiffs' side porch while tending to his chickens one evening in October 2021. The next morning, Defendant-Cameron noticed the camera and observed that it was "fac[ing] right at the front door of [his] house." Defendant-Cameron informed Defendant-Pamela of the camera's presence while they were hosting a birthday party for their daughter in their backyard. Because of the camera, Defendants moved the party to a different area of their lot so they could "enjoy a little bit of privacy while [they] were out in the [back]yard."

After the birthday party, Defendants stopped using their backyard altogether because they felt "very uncomfortable" and were fearful that Plaintiffs were "spying" on them. Defendants believed Plaintiffs installed the camera for "the sole purpose" of surveilling Defendants' movements while they were in their backyard. Specifically, Defendant-Cameron testified that he felt his "privacy had been violated." Then, in

December 2021, Plaintiffs complied with their attorney's advice to take down the camera. On 3 January 2022, the HOA reversed the decision regarding the New Fence, determining the New Fence violated the HOA covenants.

On 7 October 2022, Plaintiffs filed an amended complaint asserting private nuisance claims and requesting damages and injunctive relief. Specifically, Plaintiffs asserted the New Fence and several storage containers located on Defendants' lot constituted "spite fences." Plaintiffs alleged they were entitled to damages and an injunction requiring Defendants to remove the New Fence and storage containers. On 20 November 2022, Defendants filed an answer and second amended counterclaim asserting several causes of action, including invasion of privacy.

The case proceeded to trial on 16 January 2024. At the close of all the evidence, Plaintiffs moved for a directed verdict concerning all of Defendants' counterclaims. The trial court denied Plaintiffs' motion as to invasion of privacy. On 30 January 2024, the jury returned a verdict favorable to Defendants. The jury found that the New Fence and storage containers were not "spite fences," and that Plaintiffs were liable to Defendants for their invasion of privacy counterclaim. The trial court entered judgment accordingly on 8 May 2024. Thereafter, Plaintiffs filed a motion for JNOV, or, alternatively a new trial, which the trial court denied by order entered 13 May 2024. On 6 June 2024, Plaintiffs filed written notice of appeal.

## II. Jurisdiction

This Court has jurisdiction under N.C. Gen. Stat. § 7A-27(b)(4) (2023).

### III.  Issue

The issue is whether the trial court erred by denying Plaintiffs' motions for directed verdict and JNOV on Defendants' invasion of privacy counterclaim.

### IV.  Analysis

Plaintiffs argue they were entitled to a directed verdict or JNOV on Defendants' invasion of privacy counterclaim because the evidence was insufficient to establish an intrusion that could be considered highly offensive to a reasonable person.  We disagree.

### A.  Standard of Review

"The standard of review of the denial of a motion for a directed verdict and of the denial of a motion for JNOV are identical."  *Springs v. City of Charlotte*, 209 N.C. App. 271, 274, 704 S.E.2d 319, 322–23 (2011) (internal quotation marks and citation omitted).  Both motions "present[] the question of whether, as a matter of law, the evidence offered by the [non-moving party], when considered in the light most favorable to the [non-moving party], is sufficient to be submitted to the jury."  *Roberts v. William N. & Kate B. Reynolds Mem'l Park*, 281 N.C. 48, 53, 187 S.E.2d 721, 724 (1972); *see Vanguard Pai Lung, LLC v. Moody*, 387 N.C. 376, 379, 912 S.E.2d 788, 791 (2025).  Thus, our review of the trial court's denial of Plaintiffs' motions is de novo. *Denson v. Richmond Cnty*, 159 N.C. App. 408, 411, 583 S.E.2d 318, 320 (2003). "When reviewing a matter de novo, this Court 'considers the matter anew and freely substitutes its own judgment' for that of the lower [tribunal]."  *N.C. Farm Bureau*

*Mut. Ins. Co. v. Herring*, 385 N.C. 419, 422, 894 S.E.2d 709, 712 (2023) (quoting *In re Greens of Pine Glen Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)).

A motion for directed verdict and a motion for JNOV occur at different points during a jury trial. A motion for directed verdict, which is made "at the close of the evidence offered by an opponent," N.C. Gen. Stat. § 1A-1, Rule 50(a) (2023), "test[s] the legal sufficiency of the evidence to take the case to the jury[,]" *Snead v. Holloman*, 101 N.C. App. 462, 464, 400 S.E.2d 91, 92 (1991). On the other hand, a motion for JNOV, made after the jury has returned a verdict, "test[s] the legal sufficiency of the evidence on which the jury relied" and allows the trial court to "enter a judgment contrary to the jury's verdict if . . . the evidence presented does not support that verdict." *Vanguard Pai Lun, LLC*, 387 N.C. at 379, 912 S.E.2d at 791 (citing *Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 719–20, 693 S.E.2d 640, 643 (2009)). Of note, "[t]he legal standard applied to a JNOV motion is quite demanding and the motion should be granted 'cautiously and sparingly.'" *Id.* at 379, 912 S.E.2d at 791 (quoting *Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 369, 329 S.E.2d 333, 338 (1985)). Indeed, "[a] court may enter JNOV only if 'it appears, as a matter of law, that a recovery cannot be had by the plaintiff upon *any view* of the facts which the evidence reasonably tends to establish." *Id.* at 379, 912 S.E.2d at 792 (emphasis added) (quoting *Scarborough*, 363 N.C. at 720, 693 S.E.2d at 643 (cleaned up)).

Ultimately, "[a] motion for either directed verdict or JNOV should be denied if there is more than a scintilla of evidence supporting each element of the non-movant's

claim." *Shelton v. Steelcase, Inc.*, 197 N.C. App. 404, 410, 677 S.E.2d 485, 491 (2009) (internal quotation marks and citations omitted). "A scintilla of evidence is defined as very slight evidence" and the party moving for directed verdict or JNOV "bears a heavy burden under North Carolina law." *Maldjian v. Bloomquist*, 275 N.C. App. 103, 110, 853 S.E.2d 753, 760 (2020) (internal quotation marks and citation omitted).

**B. Intrusion Upon Seclusion**

There are four distinct invasion of privacy actions: " '(1) appropriation, for the defendant's advantage of the plaintiff's name or likeness; (2) intrusion upon the plaintiff's seclusion or solitude or into his private affairs; (3) public disclosure of embarrassing private facts about the plaintiff; and (4) publicity which places the plaintiff in a false light in the public eye.' " *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 28–29, 588 S.E.2d 20, 27 (2003) (quoting *Renwick v. News Observer Pub. Co.*, 310 N.C. 312, 322, 312 S.E.2d 405, 411 (1984)).[1]

The privacy tort of intrusion upon seclusion—the basis of Defendants' counterclaim—is actionable in North Carolina, and "is defined as 'the intentional intrusion physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . [where] the intrusion would be highly offensive to a reasonable person.'" *Maynard v. Crook*, 289 N.C. App. 357, 363, 890 S.E.2d 164, 170

---

[1] North Carolina does not recognize invasion of privacy actions for: public disclosure of private facts, *see Hall v. Post*, 323 N.C. 259, 265, 372 S.E.2d 711, 714 (1988); or placing plaintiff in a false light, *see Renwick*, 310 N.C. at 322, 312 S.E.2d at 411.

(2023) (quoting *Toomer v. Garrett*, 155 N.C. App. 462, 479, 574 S.E.2d 76, 90 (2002)) (alteration in original). Clear examples of an intrusion upon seclusion include, but are not necessarily limited to: " 'physically invading a person's home or other private place, eavesdropping by wiretapping or microphones, peering through windows, persistent telephoning, unauthorized prying into a bank account, and opening personal mail of another.' " *Broughton*, 161 N.C. App. at 29, 588 S.E.2d at 27–28 (quoting *Burgess v. Busby*, 142 N.C. App. 393, 405–06, 544 S.E.2d 4, 11 (2001)).

In the instant case, Plaintiffs assert the trial court erred by denying their motions for directed verdict and JNOV on Defendant's counterclaim for invasion of privacy because the act of installing a camera does not constitute an intrusion that would be highly offensive to a reasonable person. Effectively, Plaintiffs contend the trial court should have determined—as a matter of law—that the evidence was insufficient to establish a highly-offensive intrusion. Plaintiffs' argument merits a brief discussion of a trial court's initial inquiry regarding the "highly offensive" element before submitting a claim of intrusion upon seclusion to the jury.

## C. Highly Offensive Intrusion

Since officially recognizing the privacy tort of intrusion upon seclusion in 1996, *see Miller v. Brooks*, 123 N.C. App. 20, 27, 472 S.E.2d 350, 354 (1996), our courts have analyzed the sufficiency of the evidence for intrusion upon seclusion claims at various procedural stages, including motions to dismiss for failure to state a claim, *see, e.g.*, *Maynard*, 289 N.C. App. at 363, 890 S.E.2d at 170, and motions for summary

judgment, *see, e.g.*, *Broughton*, 161 N.C. App. at 29, 588 S.E.2d at 27. In the context of a motion for directed verdict or motion for JNOV, we have yet to analyze the sufficiency of the evidence for a claim of intrusion upon seclusion.

In *Miller v. Brooks*, this Court determined that the plaintiff's evidence was sufficient to survive the defendant's motion for summary judgment because "[a] jury *could* conclude that [the] invasions would be highly offensive to a reasonable person." 123 N.C. App. at 26–27, 472 S.E.2d at 354 (emphasis added). Conversely, in *Smith v. Jack Eckerd Corp.*, we held that "[a]lthough the incident may have been offensive to the plaintiff, . . . under the circumstances the intrusion would not be so highly offensive to the reasonable person as to constitute an invasion of privacy action." 101 N.C. App. 566, 569, 400 S.E.2d 99, 100 (1991). These cases illustrate the trial court must preliminarily assess the offensiveness of the intrusion before submitting an intrusion upon seclusion claim to the jury.

The tort claim of intentional infliction of emotional distress ("IIED"), like intrusion upon seclusion, involves a preliminary evidentiary assessment by the trial court. To establish a claim for IIED, a plaintiff must show, among other things, that the defendant's conduct was "extreme and outrageous." *Moschos v. Moschos*, 287 N.C. App. 162, 166, 882 S.E.2d 401, 404 (2022) (citations omitted). If the trial court initially determines the conduct in question "*may* reasonably be so regarded, then it is for the jury to decide whether, under the facts of a particular case, [the] defendant's conduct . . . was *in fact* extreme and outrageous." *Glenn v. Johnson*, 247 N.C. App.

660, 668, 787 S.E.2d 65, 72 (2016) (citation omitted and emphasis added). By making this initial determination, the trial court limits the jury's consideration to only those IIED claims where the conduct "*may* be reasonably [] regarded" as "extreme and outrageous." *Id.* at 668, 787 S.E.2d at 72 (citation omitted).

Similarly, for an intrusion upon seclusion claim, the trial court considers whether the alleged intrusion *could be* considered highly offensive to a reasonable person. *See Miller*, 123 N.C. App. at 26–27, 472 S.E.2d at 354. If a reasonable person *may* regard the intrusion as highly offensive, then it is for the jury to decide "whether the conduct complained of is, *in fact* sufficiently [highly offensive] to result in liability." *Bryant v. Thalhimer Bros., Inc.*, 113 N.C. App. 1, 16, 437 S.E.2d 519, 527–28 (1993) (citation omitted and emphasis added). As questions of objective reasonableness are ordinarily for the jury to decide, the jury is best positioned to determine whether a reasonable person would find an alleged intrusion to be "highly offensive." *See Hall*, 323 N.C. at 276, 372 S.E.2d at 721 (Frye, J. concurring in result) (stating "offensiveness" in the context of public disclosure of private facts "is a jury determination" because "as in negligence cases, a reasonable person standard generally requires a jury determination").

Thus, for an intrusion upon seclusion claim to survive a motion for directed verdict, the evidence, when viewed in the light most favorable to the non-moving party, must show that a reasonable person *could* find the intrusion to be highly offensive. The question is not whether the trial court or the plaintiff subjectively

finds the conduct to be highly offensive, but whether an objectively reasonable juror *could* conclude that it is. *See Miller*, 123 N.C. App. at 26–27, 472 S.E.2d at 354 (emphasis added).

## D. Discussion

Here, there was more than a scintilla of evidence showing Plaintiffs intruded upon Defendants' solitude or seclusion in a way that could be considered highly offensive to a reasonable person. *See Shelton*, 197 N.C. App. at 410, 677 S.E.2d at 491. In the midst of an ongoing dispute between neighbors, Plaintiffs placed a security camera atop a sliding glass door within their side porch pointed directly towards Defendants' backyard and home. Plaintiffs did not angle the camera down or off to the side. Instead, the lens was level, clearing the height of the New Fence, and Plaintiffs admitted that Defendants' backyard was within the camera's field of view. Further, the camera was activated by motion, and Plaintiffs testified that when the camera was triggered, they were capable of viewing what was happening through the camera lens in real-time on their phones. Granted, Plaintiffs testified that they never recorded any footage and never used the camera to "spy" on Defendants. Nevertheless, the camera's location and viewing features provided Plaintiffs with the means and the opportunity to surveil Defendants within the supposed privacy of their own backyard. Whether these facts establish a highly offensive intrusion was for the jury to decide. *See Anderson v. Hollifield*, 345 N.C. 480, 483, 480 S.E.2d 661, 664 (1997) (explaining "[i]t is the jury's function to weigh the evidence and to determine

the credibility of the witnesses").

When viewed in the light most favorable to Defendants, the evidence was sufficient to establish an intrusion that could be considered highly offensive to a reasonable person. Considering *where* the camera was installed—facing Defendant's backyard, above the New Fence line; *when* the camera was installed—during an ongoing neighborly dispute; and *how* the camera functioned—displaying footage in real-time when triggered by motion; a reasonable jury could conclude that Plaintiffs camera was a highly offensive intrusion upon Defendants' seclusion. *See Miller*, 123 N.C. App. at 26–27, 472 S.E.2d at 354. Thus, it was for the jury to decide whether the intrusion was, *in fact*, highly offensive. *See Bryant*, 113 N.C. App. at 16, 437 S.E.2d at 527. Accordingly, the trial court properly denied Plaintiffs' motions for directed verdict and JNOV on Defendants' invasion of privacy counterclaim.

## V. Conclusion

Because Plaintiffs' intrusion could be considered highly offensive to a reasonable person, the evidence was sufficient to send Defendants' invasion of privacy counterclaim to the jury. Moreover, the evidence supported the jury's verdict. Thus, the trial court did not err by denying Plaintiffs' motions for directed verdict and JNOV. Accordingly, we affirm.

AFFIRMED.

Judges STROUD and WOOD concur.